**Vader LOOMIS d/b/a Florida Center Gulf, Plaintiff,**

v.

**GULF OIL CORPORATION, Defendant.**

**No. 82–573–Orl-Civ-Ek.**

United States District Court, M.D. Florida.

March 8, 1983.

Jose A. Garcia, Winter Haven, Fla., for plaintiff.

Jeffry R. Jontz, Orlando, Fla., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

KOVACHEVICH, District Judge.

Pursuant to the Petroleum Marketing Practices Act, (hereinafter PMPA) 15 U.S.C.A. Section 2801 et seq., Plaintiff Vader Loomis (hereinafter Loomis) filed a Complaint for preliminary and permanent injunctive relief, seeking to prohibit Defendant Gulf Oil Corporation (hereinafter Gulf) from terminating and not renewing his franchise as a Gulf dealer, and his service station lease as a lessee of Gulf. Loomis alleged in Count I that Gulf's Notices of Termination failed to set forth with particularity the reasons for termination; in Count II that Gulf's notices were untimely having been sent less than ninety days prior to the date the termination was to take effect; and in Count III that the reasons for termination were not proper grounds under the PMPA. Loomis also filed a claim for wrongful eviction under Florida Statutes Chapter 82.

The Complaint of Loomis was filed on October 25, 1982. On October 25, 1982 the Court held a hearing on a Motion for a Temporary Restraining Order. The Court entered a Temporary Restraining Order on October 25, 1982, based on the stipulation of the parties that Gulf would not seek to terminate the agreements between Loomis and Gulf pending a hearing on October 29, 1982 on the condition that Gulf be paid daily for product withdrawn from the pumps. On October 29, 1982, the Court held a hearing and heard argument of Loomis, pro se, and counsel for Gulf, and extended the Temporary Restraining Order to November 4, 1982 on the condition that Gulf be paid daily for product withdrawn from the pumps. On October 29, 1982, the Court also entered an order providing that a Preliminary Injunction would be granted commencing on November 5, 1982, provided Loomis posted a good and sufficient bond in the sum of $50,000.00 conditioned to pay all costs and damages that Gulf might sustain in the event that Gulf was wrongfully enjoined or restrained, and with the further conditions that during the pendency of the Preliminary Injunction Gulf be paid daily for product withdrawn from the pumps and that Gulf be paid for rent and other obligations as incurred during the term of the Preliminary Injunction. The Order also provided that the Court would entertain Motions for Sanctions, including contempt, should either party violate the Preliminary Injunction Order. However, the Preliminary Injunction Order did not become effective because Loomis failed to post the $50,000.00 bond.

Gulf filed an Answer, Affirmative Defenses, and a Counterclaim for breach of contract based upon the alleged failure of Loomis to pay Gulf for 48,197 gallons of petroleum products, for eviction of Loomis from the service station, and replevin of certain personal property located in the station.

In addition, Gulf filed a Motion to Dismiss or Strike the unlawful eviction count contained in Loomis' Complaint, a Motion for Contempt Citation for failure of Loomis to pay for product delivered during the term of the Temporary Restraining Order, and a Motion for Summary Judgment. Therefore, on February 2, 1983, this case came on to be heard on Gulf's Motion for Summary Judgment, Motion to Dismiss the Wrongful Eviction Count from Loomis' Complaint and Motion for Contempt against Loomis for failure to pay for $3,520.21 worth of gasoline delivered by Gulf to Loomis during the period of the Temporary Restraining Order.

Having considered the arguments of counsel, the pleadings, depositions, Answers to Interrogatories, Answers to Requests for Admissions, and Affidavits on file, the Court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. Gulf and Loomis entered into a Service Station Lease dated March 1, 1982 for a service station located at 4720 South Kirkman Road, Orlando, Orange County, Florida, a Dealer Contract of Sale dated March 11, 1982, a Reseller Commodity Schedule

dated March 1, 1982, two Commodity Schedules dated March 1, 1982, a Diesel Fuel Agreement dated March 1, 1982, a Car Wash Equipment Agreement dated March 1, 1982, a Rider to Automobile Gasoline Agreement dated March 1, 1982, a New Lease Option For Service Station Location dated February 26, 1982, a Gulf Credit Card Agreement dated August 25, 1982, and a Rental Schedule dated March 1, 1982.

2. The Dealer Contract of Sale dated March 11, 1982 provides "That at the option of Seller, this contract may be terminated after written notice as required by law (1) upon the failure of Purchaser to desist from any such further acts or conduct after written notice from Seller to do so, or (2) upon Purchaser's failure to pay any amount when and as due, and no forbearance, course of dealing, or prior payment shall affect these rights of termination. If at any time the financial responsibility of Purchaser shall become impaired or unsatisfactory to Seller, or should Purchaser be in arrears in his accounts with Seller, Seller may require, as a condition of making further deliveries under this contract, payment by Purchaser of all past due accounts and cash payment for all future deliveries."

3. The Automobile Gasoline Agreement dated March 1, 1982 provides "Gulf retains the option of accepting payment for the gasoline delivered hereunder or the return of the gasoline as provided for herein. Dealer is authorized to sell the gasoline to his customers in the ordinary course of his business and such prices and on such terms as the Dealer shall determine, and it is agreed that title to said gasoline shall pass to the Dealer at the meters on the pumps. Dealer shall pay Gulf for all gasoline so purchased and withdrawn by dealer when and as directed, Gulf's dealer-tank wagon price plus all applicable federal, state and local excise taxes, prevailing at the time and place of such purchase and withdrawal by Dealer for the grade and quantity of gasoline so purchased."

4. The Automative Gasoline Agreement further provides that "Should Dealer refuse or fail to pay when and as directed by Gulf for all gasoline purchased and withdrawn from storage by Dealer or should Dealer fail to pay Gulf for any gallonage rental due Gulf or any other indebtedness due Gulf which is based on gallonage, then in such event Gulf shall have the right to: (a) Forthwith terminate this Agreement by written notice to Dealer and to lock the pumps to prevent further withdrawals from storage, or (b) Suspend this Agreement by locking the pumps until Dealer has paid Gulf all monies due and owing to Gulf under this paragraph. In the event Dealer's obligation to Gulf hereunder is satisfied prior to written notice to Dealer of termination as above provided, this Agreement will be automatically reinstated and deliveries hereunder will be resumed. The above remedies shall be deemed to be cumulative, and the election by Gulf of one remedy shall not preclude it from exercising any other remedy provided for in this Agreement."

5. The Automotive Gasoline Agreement dated March 1, 1982, provides that "The pumps, meters and computers located upon the premises have been jointly checked by Gulf and Dealer and are believed to be accurate. Either party, at its own expense and upon prior notice to the other party, may at any time cause the pumps, meters, and computers to be inspected and repaired as needed; but all previous pump, meter and computer readings shall be conclusively presumed between the parties to have been correct. Dealer agrees to give Gulf notice immediately of any defective conditions of said pumps, meters and computers."

6. The Service Station Lease dated March 1, 1982 provides "Concurrently herewith, Lessor and Lessee have entered into a Contract of Sale covering petroleum products. Lessee agrees, as a covenant of this lease, that the breach of any of the terms or conditions of said Contract of Sale shall constitute a breach of this Lease, and that termination of said Contract of Sale shall, at the option of the Lessor terminate this Lease."

7. Gulf Oil Corporation placed petroleum products in tanks located on the premis-

es leased to Loomis on a consignment basis. Under the agreements, title to the gasoline passed to Loomis when the petroleum products passed through the meters on the pumps, and Loomis became obligated immediately to pay Gulf for all petroleum products so purchased and withdrawn.

8. On October 18, 1982, Loomis met with Mr. A.J. D'Amico, General Manager of the Florida Marketing District of Gulf Oil Corporation, and presented an Automotive Gasoline Agreement Settlement form showing that Loomis was indebted to Gulf for 48,197 gallons of petroleum products, and that the amount due and owing to Gulf was $56,233.52. At that meeting D'Amico advised Loomis that Gulf would require a minimum payment of $35,000.00 on or before October 21, 1982, and the balance was to be paid at the rate of 2¢ a gallon on future dealer sales as a condition of maintaining the contractual agreements between Gulf and Loomis.

9. Thereafter, Gulf prepared and hand delivered to Loomis on October 19, 1982, a letter embodying in writing the terms which D'Amico had orally related to Loomis on October 18, 1982. A copy of the letter is attached hereto as Appendix A. The letter provided that failure to comply with the provisions of the letter would result in Gulf terminating or nonrenewing the Automotive Gasoline Agreement, Service Station Lease Agreement, Contract of Sale and Commodity Schedule, and any and all other contracts and agreements by and between Gulf and Loomis. Attached to the letter was a copy of the Department of Energy Summary of Title One of the Petroleum Marketing Practices Act.

10. On October 21, 1982, Gulf hand delivered a second letter to Loomis advising that Loomis had failed to make payment as required in the October 19, 1982 letter. A copy of the October 21 letter is attached hereto as Appendix B. Gulf also notified Loomis that as required by Section 104 of the PMPA, 15 U.S.C.A. 2804, notice was given that pursuant to subsections 102(b)(2)(C) and 102(c)(8) of the PMPA, all agreements between Gulf and Loomis were terminated as of October 21, 1982. Loomis was advised to remove his personal property and vacate the premises by 5:00 p.m. on October 25, 1982. Again Gulf attached a copy of the Department of Energy Summary of the Petroleum Marketing Practices Act.

11. Affidavits of Gulf employees Gordon Bryant, S.E. Branch and Bill Masur and S.E. Branch establish meter readings and physical inventories of petroleum products at the station operated by Loomis on August 4, 1982, October 8, 1982 and October 18, 1982, respectively. In addition, affidavits of Alvin W. Woods, III and Benjamin Bathke, employees of Florida Petroleum Services, Inc., establish the meter readings at the station operated by Loomis on October 8, 11, and 12 respectively. A comparison of these reports, together with the Automotive Gasoline Agreement Settlement Report delivered by Loomis to D'Amico on October 18, 1982 establishes that between August 4, 1982 and October 8, 1982 Loomis sold 35,340 gallons of petroleum products for which he has not paid Gulf, and between October 8 and October 12, 1982, Loomis sold an additional 12,857 gallons of petroleum products for which he has not paid Gulf, for a total shortfall of 48,197 gallons.

12. In addition, and as a means of verifying the accuracy of the meter readings, C.F. Patterson, Manager of Finance and Service for the Florida Marketing Division of Gulf Oil Corporation, by affidavit, testified that a review of (A) the physical inventories present on August 4, 1982, (B) deliveries from August 4 through August 18, 1982 by Gulf to Loomis' station, (C) reports by Loomis on the Automotive Gasoline Agreement Settlement reports submitted to Gulf from August 4, 1982 to October 18, 1982, and (D) the physical Inventory of petroleum products at Loomis' station on October 18, 1982 confirms the shortfall in payment for product independent of the meter readings on the pumps at Loomis' station. The Patterson affidavit also establishes that at various times throughout the period of August 4 through October 18,

596

1982, a comparison of the physical inventories at the station and records of deliveries to the station against Loomis' report of petroleum products sold at the station results in book inventories in some cases two times the capacity of the tanks at Loomis' station. In other words, for Loomis' record of sales during the period to have been correct, Loomis would have had in some cases twice as much gasoline at the station as his tanks had physical capacity to hold, thus establishing that during the period of August 4, 1982 through October 18, 1982, Loomis backread the meters to avoid paying Gulf for all petroleum products passing through the meters and sold by Loomis.

13. This is not the first time that Gulf has had financial difficulty with Loomis. The affidavit of J.E. Kittrell, Retail Sales Supervisor for the Florida Marketing District of Gulf Oil Corporation, details numerous financial problems with Loomis over the years, in increasing amounts, culminating in a February 4, 1982 meeting with Loomis at which time Loomis advised that five (5) checks given to Gulf by Loomis would "bounce" resulting in unpaid invoices of $54,244.00. Therefore, Gulf has had recurring financial difficulties with Loomis over the years prior to the present incident.

14. At the deposition of Vader Loomis taken on December 28, 1982, Loomis admitted that he had been having trouble meeting his financial obligations in 1982. (Loomis deposition page 29).

15. In opposition to the evidence established by Gulf, Loomis has come forward with no evidence that he does not owe Gulf $56,233.52 for 48,197 gallons of gasoline for the period of August 4, 1982 through October 18, 1982. His presentation to D'Amico of an AGA Settlement Report on October 18, 1982 showing a shortfall of 48,197 gallons of petroleum products is an admission that the funds are due Gulf. In addition, at an earlier hearing in this case on the Motion for Temporary Restraining Order, which hearing was held on the record, Loomis, appearing pro se, admitted in open court that he probably owed Gulf at least $30,-000.00 for petroleum products. At the

hearing on the Motion for Summary Judgment on February 2, 1983, counsel for Loomis advised the Court that Loomis had filed no affidavits presenting facts to refute Gulf's position, and counsel admitted that Loomis could not refute the Gulf evidence with respect to the shortfall in payment for petroleum products.

16. In addition, Loomis has admitted that he failed to pay Gulf $3,520.21 for petroleum products delivered during the pendency of the Temporary Restraining Order. During the time the Temporary Restraining Order was in effect, Gulf was ordered to deliver petroleum products on a regular basis, and Loomis was ordered to pay Gulf on a daily basis for said deliveries. However, Loomis failed to pay for the last day of delivery in the amount of $3,520.21. During Loomis' deposition he testified that he received product during the Temporary Restraining Order, but that he failed to pay Gulf for the last day of delivery. (Loomis deposition pages 33–36).

17. By October 18, 1982, Loomis was indebted to Gulf Oil Corporation in the amount of $56,232.52. As of October 18, 1982, Loomis had a credit balance in his account with Gulf in the amount of $5,622.69. When the credit balance of $5,622.69 is subtracted from the amount owed by Loomis to Gulf of $56,232.52 Loomis owed Gulf $50,610.83.

18. In addition, as of November 4, 1982, Loomis owed Gulf an additional $3,520.21 for the last day of delivery of product during the Temporary Restraining Order.

19. The $50,610.83 owed by Loomis to Gulf as of October 21, 1982 and the $3,520.21 owed by Loomis to Gulf as of November 4, 1982 have not been paid by Loomis to Gulf, and constitute breaches of the Dealer Contract of Sale, Automotive Gasoline Agreement and Service Station Lease specified above.

20. Throughout these proceedings Gulf has been the owner and Lessor of the station at 4720 South Kirman Road, and Loomis has been in possession and has operated the station.

## CONCLUSIONS OF LAW

1. The notices sent by Gulf to Loomis on October 19 and October 21 set forth with particularity the reasons for termination or nonrenewal as required by the PMPA. Title 15 U.S.C.A., Section 2804(c) provides:

Notification under this section (1) shall be in writing; (2) shall be posted by certified mail or personally delivered to the franchisee; and (3) shall contain (A) a statement of intention to terminate the franchise or not to renew the franchise relationship, together with the reasons therefor; (B) the date on which such termination or nonrenewal takes effect; and (C) the summary statement provided under subsection (d) of this section.

2. Gulf's notices of default and intention to terminate as contained in the October 19, 1982 and October 21, 1982 letters advised Loomis in writing of his failure to make Automotive Gasoline Agreement settlement payments when due, and were hand delivered to Loomis. The letters also contained a statement of intention to terminate the franchise or not to renew the franchise relationship because of the failure to make Automotive Gasoline Agreement settlement payments when due, and stated the date upon which such termination or nonrenewal would take effect. The letters attached the Department of Energy summary of Title One of the PMPA. The notices comply with the PMPA. Complete copies of the letters and attachments are attached as Appendix A and B to this Order.

3. The reasons given are adequate to comply with the PMPA notice provisions if they apprise the party of the reason for nonrenewal so that he can determine if the franchisor has complied with the provisions of the PMPA. *Orr v. Texaco, Inc.,* No. C80–1983A (N.D.Ga. December 5, 1980), 1980–81 Trade Cases ¶ 63, 672. In *Orr* the Court held that there is no support in the legislative history of the PMPA for an argument that the reason given must parrot the specific provision upon which it is based. In *Brach v. Amoco Oil Company,* 677 F.2d 1213 (7th Cir.1982) the Court stated that the "PMPA requires only that the fran-

chisor articulate with sufficient particularity the basis for the decision not to renew so that the franchisee can determine his rights under the Act." 677 F.2d at 1226.

4. "In determining the sufficiency of notices of nonrenewal, courts have considered, not only the reason stated in the formal notice, but all the facts about nonrenewal known to the franchisee." *Sutton v. Atlantic Richfield Company,* 539 F.Supp. 658, 660 (C.D.Cal.1982).

5. Gulf acted reasonably in terminating the franchise with less than ninety (90) days notice under the circumstances of this case. The PMPA, Section 15 U.S.C.A. Section 2804(a)(2) provides for ninety days notice of termination of a franchise. However, 15 U.S.C.A. Section 2804(b)(1) allows a franchisor to terminate or not renew a franchise on less than ninety days notice where it would not be reasonable for the franchisor to furnish ninety days notice. Under the circumstances of this case, Gulf's notices of October 19, 1982 and October 21, 1982 complied with the specific PMPA exception to the ninety day notice requirement. As shown by the letters, Loomis was given three days from the October 18th meeting in which to cure the deficiency and five days additional time to vacate after termination on October 21. In the present case Loomis developed a deficiency in payment to Gulf of $56,233.52 in a period of thirty (30) to sixty (60) days. Requiring Gulf to continue to provide product to Loomis for an additional ninety days would expose Gulf to potential large additional deficiencies for the remainder of the ninety day termination period. Based on this circumstance alone, it would not be reasonable to require franchisor to continue to do business with franchisee for an additional ninety days after discovery of a shortfall of this magnitude in a thirty to sixty day period.

6. Further the reasons given by Gulf for terminating or refusing to renew Loomis' franchise in its letters of October 19 and 21, 1982 are proper and sufficient under the PMPA. 15 U.S.C.A. Section 2802(b) provides that a franchisor may ter-

minate any franchise or fail to renew any franchise relationship based upon the occurrence of an event which is relevant to the franchise relationship. Section 2802(c) states that an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable includes failure by the franchisee to pay to the franchisor in a timely manner when due all sums to which the franchisor is legally entitled. The terms of the Dealer Contract for Sale, the Automotive Gasoline Agreement, and the Service Station Lease, all of which have been specified above, clearly delineate the obligation of the dealer to pay Gulf for gasoline when it passes through the pumps, and provides that failure to so pay is a default in the agreements entitling Gulf to terminate the agreements.

■ 7. Loomis has remained in possession of the service station throughout the pendency of these proceedings, and therefore Gulf's Motion to Dismiss Count IV of Loomis' Complaint alleging wrongful eviction is granted and Count IV is dismissed for failure to state a claim upon which relief can be granted. An essential element of a claim for either forcible entry or unlawful entry and unlawful detention is that the Plaintiff has been ousted of possession and Defendants withhold possession without their consent. *Florida Athletic and Health Club v. Royce,* 160 Fla. 27, 33 So.2d 222, 224 (1948).

8. The Court reserves ruling on the Motion for Contempt filed by Gulf without prejudice to Gulf to renew the motion at a later time.

■ 9. Based upon the foregoing findings of fact and conclusions of law, the Court concludes that there is no genuine issue of material fact, and that summary judgment should be entered in favor of Gulf Oil Corporation and against Vader Loomis on the Complaint filed by Vader Loomis and the Counterclaim filed by Gulf Oil Corporation.

10. Gulf Oil Corporation is entitled to recover from Defendant Vader Loomis the amount of $50,610.83 with interest at the rate of 12% from October 18, 1982, in the amount of $2,179.73 and $3,520.21 with interest at the rate of 12% from November 4, 1982, in the amount of $143.51 for a total amount due and owing to Gulf of $56,454.28. The Clerk is directed to enter a final judgment in favor of Gulf Oil Corporation and against Vader Loomis in the amount of $56,454.28 on a separate document pursuant to Rule 58 of the Federal Rules of Civil Procedure.

11. In addition, Gulf Oil Corporation is entitled to possession of the premises located at 4720 South Kirkman Road, Orlando, Florida, and the Clerk is directed to enter a Writ of Possession in favor of Gulf Oil Corporation and against Vader Loomis on a separate document pursuant to Rule 70 of the Federal Rules of Civil Procedure.

## APPENDIX A
### GULF REFINING AND MARKETING COMPANY
FLORIDA DISTRICT OFFICE

October 19, 1982

Mr. Vader M. Loomis
4720 S. Kirkman Road
Orlando, Florida 32805

Dear Mr. Loomis:

This letter acknowledges our conversation of October 18, 1982 with regard to your indebtedness of $56,233.52 as a result of shortages on your AGA settlements.

The terms of payment of the above amount will be as follows:

1. $35,000 payable on or before October 21, 1982; at 12:00 P.M.

2. The balance of the indebtedness will be paid in monthly installments of not less than $5,000 in any one month, including the full amount of interest calculated at 15% per annum will be due on this balance at the time of payment of each installment balance.

Monthly installments shall be paid pro rata as follows:

(a) 2¢ paid along with Automotive Gasoline Agreement settlements when due beginning October 22, 1982.

(b) The difference, if any, between the CPG partial payment and the monthly minimum installment to be paid no la-

ter than the monthly installment due date.

3. The first monthly installment shall be made on the 21st day of November 1982 and a like payment on the 21st day of each month thereafter until the whole sum of principal and interest is paid in full.

4. Thereafter you will continue making the monthly payment until such time as you have accrue enough funds that enable you to purchase the gasoline inventory. At this time you will be removed from the AGA Program.

5. Installments shall be paid by Certified Funds, hand-delivered Gulf Oil Corporation Bulk Plant, 1212 West Livingston Street, Orlando, Florida.

Failure to comply with the above provisions which include the execution and return of the attached note or payment in full in the amount of $56,233.52 leaves us no alternative other than terminating or non-renewing the Automotive Gasoline Agreement, Service Station Lease Agreement, Contract of Sale and Commodity Schedule, and any and all other contracts and agreements by and between Gulf Oil Corporation and Vader M. Loomis, said termination or non-renewal to be effective October 21, 1982. We enclose herewith copy of Department of Energy Summary of Title I of the Petroleum Marketing Practices Act.

Very truly yours,

/s/ A.J. D'Amico

A.J. D'Amico

WR:tf

Enclosures

Acknowledgement of Receipt

_____

(Signature)

_____

(Date)

## SUMMARY OF DEALER RIGHTS AT TERMINATION OR NONRENEWAL

AGENCY: Department of Energy

ACTION: Notice

SUMMARY: This notice contains a summary of Title I of the Petroleum Marketing Practices Act, a new federal law enacted on June 19, 1978. The law is intended to protect franchised distributors and retailers of gasoline and diesel motor fuel against arbitrary or discriminatory termination or nonrenewal of franchises. The summary describes the reasons for which a franchise may be terminated or not renewed under the new law, the responsibilities of franchisors, and the remedies and relief available to franchisees. Franchisors must give franchisees copies of the summary contained in this notice whenever notification of termination or nonrenewal of a franchise is given.

SUPPLEMENTARY INFORMATION:

Title I of the Petroleum Marketing Practices Act. Pub.L. 95–297 (the "Act"), enacted on June 19, 1978, provides for the protection of franchised distributors and retailers of motor fuel by establishing minimum Federal standards governing the termination of franchises and the nonrenewal of franchise relationships by the franchisor or distributor of such fuel. Section 104(d)(1) of the Act provides that the Secretary of Energy shall prepare and publish in the *Federal Register* not later than 30 days after enactment of the Act a simple and concise summary of the provisions of Title I, including a statement of the respective responsibilities of and the remedies and relief available to, franchisors and franchisees under that title.

As required by section 104(d)(1) of the Act, the following is a summary statement of the respective responsibilities of, and the remedies and relief available to, franchisors and franchisees. Franchisors must give copies of this summary statement to their franchisees when entering an agreement to terminate the franchise or not to renew the franchise relationship, and when giving notification of termination or nonrenewal in addition to the summary of the provisions of Title I, a more detailed description of the definitions contained in the Act and of the legal remedies available to franchisees is

also included in this notice, following the summary statement.

## SUMMARY OF LEGAL RIGHTS OF MOTOR FUEL FRANCHISEES

This is a summary of the franchise protection provisions of the federal Petroleum Marketing Practices Act. This summary must be given to you, as a person holding a franchise for the sale, consignment or distribution of gasoline or diesel motor fuel, in connection with any termination or nonrenewal of your franchise by your franchising company (referred to in this summary as your supplier).

The franchise protection provisions of the Act apply to a variety of franchise arrangements. The term "franchise is broadly defined as a license to use a motor fuel trademark which is owned or controlled by a refiner, and it includes secondary arrangements such as leases of real property and motor fuel supply agreements which have existed continuously since May 15, 1973 regardless of a subsequent withdrawal of a trademark. Thus, if you have lost the use of a trademark previously granted by your supplier but have continued to receive motor fuel supplies through a continuation of a supply agreement with your supplier, you are protected under the Act.

You should read this summary carefully, and refer to the Act if necessary, to determine whether a proposed termination or nonrenewal of your franchise is lawful, and what legal remedies are available to you if you think the proposed termination or failure to renew is not lawful. In addition, if you think your supplier has failed to comply with the Act, you may wish to consult an attorney in order to enforce your legal rights.

The Act is intended to protect you, whether you are a distributor or a retailer, from arbitrary or discriminatory termination or nonrenewal of your franchise agreement. To accomplish this, the Act first lists the reasons for which termination or nonrenewal is permitted. Any notice of termination or nonrenewal must state the precise reason as listed in the Act for which the particular termination or nonrenewal is being made. These reasons are described below under the headings "Reasons for Termination" and "Reasons for Nonrenewal."

You should note that the Act does not restrict the reasons which may be given for the *termination* of a franchise agreement: entered into before the June 19, 1978 effective date of the Act. However, any *nonrenewal* of such a terminated franchise must be based on one of the reasons for nonrenewal summarized below.

The Act also requires your supplier to give you a written notice of termination or intention not to renew the franchise within certain time periods. These requirements are summarized below under the heading Notice Requirements for Termination or Nonrenewal.

The Act allows trial and interim franchise agreements which are described below under the heading "Trial and Interim Franchises."

The Act gives you certain legal rights if your supplier terminates or does not renew your franchise in a way that is not permitted by the Act. These legal rights are described below under the heading "Your Legal Rights."

This summary is intended as a simple and concise description of the general nature of your rights under the Act. For a more detailed description of these rights, you should read the text of the Petroleum Marketing Practices Act itself (Pub.L. 95–297, 92 Stat. 322, 15 U.S.C. 2801).

### I. Reasons for Termination

The following is a list of the only reasons for which your franchise is permitted to be terminated by the Act. One or more of these reasons must be specified if your franchise was entered into on or after June 19, 1978 and is being terminated. If your franchise was entered into before June 19, 1978, as discussed above, there is no statutory restriction on the reasons for which it may be terminated. If such a franchise is terminated, however, the Act requires the supplier to renew the franchise relationship

·unless one of the reasons listed under this heading or one of the additional reasons for nonrenewal described below under the heading "Reasons for Nonrenewal" exists.

If your supplier attempts to terminate a franchise which you entered into on or after June 19, 1978 for a reason that is not listed under this heading, you can take the legal action against your supplier that is described below under the heading "Your Legal Rights."

Non-Compliance with Franchise Agreement

Your supplier may terminate your franchise if you do not comply with a reasonable and important requirement of the franchise relationship in order to use this reason, your supplier must have learned of this non-compliance recently. The Act limits the time period within which your supplier must have learned of your non-compliance to various periods, the longest of which is 120 days, before you receive notification of the termination.

Lack of Good Faith Efforts

Your supplier may terminate your franchise if you have not made good faith efforts to carry out the requirements of the franchise, provided you are first notified in writing that you are not meeting a requirement of the franchise and you are given an opportunity to make a good faith effort to carry out the requirement. This reason can be used by your supplier only if you fail to make good faith efforts to carry out the requirements of the franchise for a period of 180 days before you receive the notice of termination.

Mutual Agreement to Terminate the Franchise

A franchise can be terminated by an agreement in writing between you and your supplier if the agreement is entered into not more than 180 days before the effective date of the termination and you receive a copy of this agreement, together with this summary statement of your rights under the Act. You may cancel the agreement to terminate within 7 days after you receive a copy of the agreement, by mailing (by certi-fied mail) a written statement to this effect to your supplier.

Withdrawal from the Market Area

Under certain conditions the Act permits your supplier to terminate your franchise if your supplier is withdrawing from marketing activities in the entire geographic area in which you operate. You should read the Act for a more detailed description of the conditions under which market withdrawal terminations are permitted.

*Other Events Permitting a Termination*

If your supplier learns within the time period specified in the Act (which in no case is more than 120 days prior to the termination notice) that *one of the following events* has occurred, your supplier may terminate your franchise agreement:

(1) Fraud or criminal misconduct by you that relates to the operation of your marketing premises.

(2) You declare bankruptcy or a court determines that you are insolvent.

(3) You have a severe physical or mental disability lasting at least 3 months which makes you unable to provide for the continued proper operation of the marketing premises.

(4) Expiration of your supplier's underlying lease to the leased marketing premises, *if* you were given written notice before the beginning of the term of the franchise of the duration of the underlying lease *and* that the underlying lease might expire and not be renewed during the term of the franchise.

(5) Condemnation or other taking by the government, in whole or in part, of the marketing premises pursuant to the power of eminent domain if the termination is based on a condemnation or other taking, your supplier must give you a fair share of any compensation which he receives for any loss of business opportunity or good will.

(6) Loss of your supplier's right to grant the use of the trademark that is the subject of the franchise, unless the loss was because of bad faith actions by your supplier relating to trademark abuse, violation of Federal or State law, or other fault or negligence.

(7) Destruction (other than by your supplier) of all or a substantial part of your marketing premises. If the termination is based on the destruction of the marketing premises and if the premises are rebuilt or replaced by your supplier and operated under a franchise, your supplier must give you a right of first refusal to this new franchise.

(8) Your failure to make payments to your supplier of any sums to which your supplier is legally entitled.

(9) Your failure to operate the marketing premises for 7 consecutive days, or any shorter period of time which, taking into account facts and circumstances, amounts to an unreasonable period of time not to operate.

(10) Your intentional adulteration, mislabeling or misbranding of motor fuels or other trademark violations.

(11) Your failure to comply with Federal, State, or local laws or regulations of which you have knowledge and that relate to the operation of the marketing premises.

(12) Your conviction of any felony involving moral turpitude

(13) Any event that affects the franchise relationship and as result of which termination is reasonable.

## II. Reasons for Nonrenewal

If your supplier gives notice that he does not intend to renew any franchise agreement, the Act requires that the reason for nonrenewal must be either one of the reasons for termination listed immediately above, or one of the reasons for nonrenewal listed below.

Failure to Agree on Changes or Additions to Franchise

If you and your supplier fail to agree to changes in the franchise that your supplier in good faith has determined are required, and your supplier's insistence on the changes is not for the purpose of preventing renewal of the franchise, your supplier may decline to renew the franchise.

Customer Complaints

If your supplier has received numerous customer complaints relating to the condition of your marketing premises or to the conduct of any of your employees, and you have failed to take prompt corrective action after having been notified of these complaints, your supplier may decline to renew the franchise.

Unsafe or Unhealthful Operations

If you have failed repeatedly to operate your marketing premises in a clean, safe and healthful manner after repeated notices from your supplier, your supplier may decline to renew the franchise.

Operation of Franchise is Uneconomical

Under certain conditions specified in the Act, your supplier may decline to renew your franchise if he has determined that renewal of the franchise is likely to be uneconomical. Your supplier may also decline to renew your franchise if he has decided to convert your marketing premises to a use other than for the sale of motor fuel, to sell the premises, or to materially alter, add to, or replace the premises.

## III. Notice Requirements for Termination or Nonrenewal

The following is a description of the requirements for the notice which your supplier must give you before he may terminate your franchise or decline to renew your franchise relationship. These notice requirements apply to all franchise terminations, including franchises entered into before June 19, 1978 and trial and interim franchises, as well as to all nonrenewals of franchise relationships.

How Much Notice is Required

In most cases, your supplier must give you notice of termination or nonrenewal at least 90 days before the termination or nonrenewal takes effect.

In circumstances where it would not be reasonable for your supplier to give you 90 days notice, he must give you notice as soon as he can do so in addition, if the franchise involves leased marketing premises, your supplier may not establish a new franchise

relationship involving the same premises until 30 days after notice was given to you or the date the termination or nonrenewal takes effect, whichever is later if the franchise agreement permits, your supplier may repossess the premises and, in reasonable circumstances, operate them through his employees or agents.

If the termination or nonrenewal is based upon a determination to withdraw from the marketing of motor fuel in the area, your supplier must give you notice at least 180 days before the termination or nonrenewal takes effect.

*Manner and Contents of Notice*

To be valid, the notice must be in writing and must be sent by certified mail or personally delivered to you it must contain

(1) a statement of your supplier's intention to terminate the franchise or not to renew the franchise relationship, together with his reasons for this action,

(2) the date the termination or nonrenewal takes effect; and

(3) a copy of this summary.

### IV. Trial Franchises and Interim Franchises

The following is a description of the special requirements that apply to trial and interim franchises.

Trial Franchises

A trial franchise is a franchise, entered into on or after June 19, 1978, in which the franchisee has not previously been a party to a franchise with the franchisor and which has an initial term of one year or less. A trial franchise must be in writing and must make certain disclosures, including that it is a trial franchise, and that the franchisor has the right not to renew the franchise relationship at the end of the initial term by giving the franchisee proper notice.

The unexpired portion of a transferred franchise (other than a trial franchise, as described above) does not qualify as a trial franchise.

In exercising his right not to renew a trial franchise at the end of its initial term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

Interim Franchises

An interim franchise is a franchise, entered into on or after June 19, 1978, the duration of which, when combined with the terms of all prior interim franchises between the franchisor and the franchisee, does not exceed 3 years, and which begins immediately after the expiration of a prior franchise involving the same marketing premises which was not renewed, based upon a lawful determination by the franchisor to withdraw from marketing activities in the geographic area in which the franchisee operates.

An interim franchise must be in writing and must make certain disclosures, including that it is an interim franchise and that the franchisor has the right not to renew the franchise at the end of the term based upon a lawful determination to withdraw from marketing activities in the geographic area in which the franchisee operates.

In exercising his right not to renew a franchise relationship under an interim franchise at the end of its term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

### V. Your Legal Rights

Under the enforcement provisions of the Act, you have the right to sue your supplier if he fails to comply with the requirements of the Act. The courts are authorized to grant whatever equitable relief is necessary to remedy the effects of your supplier's failure to comply with the requirements of the Act, including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief. Actual damages, exemplary (punitive) damages under certain circumstances, and reasonable attorney and expert witness fees are also authorized. For a more detailed description of

these legal remedies you should read the text of the Act.

## FURTHER DISCUSSIONS OF TITLE I–DEFINITIONS AND LEGAL REMEDIES

### I. Definitions

Section 101 of the Petroleum Marketing Practices Act sets forth definitions of the key terms used throughout the franchise protection provisions of the Act. The definitions from the Act which are listed below are of those terms which are most essential for purposes of the foregoing summary statement (You should consult section 101 of the Act for additional definitions not included here.)

Franchise

A franchise is any contract between a refiner and a distributor, between a refiner and a retailer, between a distributor and another distributor, or between a distributor and a retailer, under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.

The term "franchise" includes any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy. The term also includes any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed under a trademark owned or controlled by a refiner, or under a contract which has existed continuously since May 15, 1973, and pursuant to which, on May 15, 1973, motor fuel was sold, consigned or distributed under a trademark owned or con-

trolled on such date by a refiner. The unexpired portion of a transferred franchise is also included in the definition of the term.

Franchise Relationship

The term "franchise relationship" refers to the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.

Franchisee

A franchisee is a retailer or distributor who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

Franchisor

A franchisor is a refiner or distributor who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

Marketing Premises

Marketing premises are the premises which, under a franchise, are to be employed by the franchisee in connection sale, consignment, or distribution of motor fuel.

Leased Marketing Premises

Leased marketing premises are marketing premises owned, leased, or in any way controlled by a franchisor and which the franchisee is authorized or permitted, under the franchise, to employ in connection with the sale, consignment, or distribution of motor fuel.

Fail to Renew or Nonrenewal

The terms "fail to renew" and "nonrenewal" refer to a failure to reinstate, continue, or extend a franchise relationship (1) at the conclusion of the term, or on the expiration date, stated in the relevant franchise, (2) at any time, in the case of the relevant franchise which does not state a term of duration or an expiration date, or (3) following a termination (on or after June 19, 1978) of the relevant franchise which was entered into prior to June 19,

1978 and has not been renewed after such date.

## II. Legal Remedies Available to Franchisee

The following is a more detailed description of the remedies available to the franchisee if a franchise is terminated or not renewed in a way that fails to comply with the Act.

### Franchisee's Right to Sue

A franchisee may bring a civil action in United States District Court against a franchisor who does not comply with the requirements of the Act. The action must be brought within one year after the date of termination or nonrenewal or the date the franchisor fails to comply with the requirements of the law, whichever is later.

### Equitable Relief

Courts are authorized to grant whatever equitable relief is necessary to remedy the effects of a violation of the law's requirements. Courts are directed to grant a preliminary injunction if the franchisee shows that there are sufficiently serious questions, going to the merits of the case to make them a fair ground for litigation, and if, on balance, the hardship which the franchisee would suffer if the preliminary injunction is not granted will be greater than the hardship which the franchisor would suffer if such relief is granted.

Courts are not required to order continuation or renewal of the franchise relationship if the action was brought after the expiration of the period during which the franchisee was on notice concerning the franchisor's intention to terminate or not renew the franchise agreement.

### Burden of Proof

In an action under the Act, the franchisee has the burden of proving that the franchise was terminated or not renewed. The franchisor has the burden of proving, as an affirmative defense, that the termination or nonrenewal was permitted under the Act and, if applicable, that the franchisor complied with certain other requirements relating to terminations and nonrenewals based on condemnation or destruction of the marketing premises.

### Damages

A franchisee who prevails in an action under the Act is entitled to actual damages and reasonable attorney and expert witness fees. If the action was based upon conduct of the franchisor which was in willful disregard of the law's requirements or the franchisee's rights under the law exemplary (punitive) damages may be awarded where appropriate. The court and not the jury, will decide whether to award exemplary damages and, if so, in what amount.

On the other hand, if the court finds that the franchisee's action is frivolous, it may order the franchisee to pay reasonable attorney and expert witness fees.

### Franchisor's Defense to Permanent Injunctive Relief

Courts may not order a continuation or renewal of a franchise relationship if the franchisor shows that the basis of the nonrenewal of the franchise relationship was a determination made in good faith and in the normal course of business:

(1) to convert the leased marketing premises to a use other than the sale or distribution of motor fuel;

(2) to materially alter, add to, or replace such premises;

(3) to sell such premises;

(4) to withdraw from marketing activities in the geographic area in which such premises are located, or

(5) that renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or additions to the franchise provisions which may be acceptable to the franchisee.

In making this defense, the franchisor also must show that he has complied with the notice requirements of the Act.

This defense to permanent injunctive relief, however, does not affect the franchisee's right to recover actual damages and reasonable attorney and expert witness fees if the nonrenewal is otherwise prohibited under the Act.

Issued in Washington, D.C. on August 23, 1978.

## APPENDIX B

### GULF REFINING AND MARKETING COMPANY

FLORIDA DISTRICT OFFICE

Mr. Vader M. Loomis
4720 S. Kirkman Road          HAND DELIVER
Orlando, Florida 32805

Reference: Notice of Default and Intention to Termi-
nate Agreements – Service Station Premises
4720 S. Kirkman Road
Orlando, Florida 32805

Dear Mr. Loomis:

Gulf has previously advised you on October 18, 1982 and October 19, 1982 of your failure to properly make AGA settlements when due. On October 19, 1982 Gulf offered you a deferred payment schedule. None of the debt has been paid.

As required by Section 104 of the Petroleum Marketing Practices Act (PMPA) 15 U.S.C.A. § 2804, this is notice to you that pursuant to subsections 102(b)(2)(C) and 102(c)(8) of the PMPA, Section 7(a) of the Automotive Gasoline Agreement and Clause (2) of the sixth paragraph of the Dealer Contract of Sale, all of our agreements, including, but not limited to, those listed below, will be terminated at 12:00 P.M. (Noon) on October 21, 1982.

| | |
|---|---|
| Rental Schedule | Dated 3/ 1/82 |
| Gulf Credit Card Agreement | Dated 8/25/82 |
| Service Station Lease | Dated 3/ 1/82 |
| Automotive Gasoline Agreement | Dated 3/ 1/82 |
| Rider – Automotive Gasoline Agreement | Dated 3/ 1/82 |
| Contract of Sale | Dated 3/ 1/82 |
| Diesel Fuel Agreement | Dated 3/ 1/82 |
| Commodity Schedule (G–46300–B) | Dated 3/ 1/82 |
| Car Wash Agreement | Dated 3/ 1/82 |
| Commodity Schedule (G–46301–B) | Dated 3/ 1/82 |

Please arrange to remove your personal property and vacate the premises by 5:00 P.M. on October 25, 1982.

As required by subsection 104(c)(3)(C) of the PMPA, 15 U.S.C.A. § 2804(c)(3)(C), a copy of the Department of Energy Summary of the PMPA is enclosed. Please signify by your signature in the appropriate place on a copy of this letter that you received this summary. Acknowledgment of receipt of the summary in no way changes any rights you may have. If you have any questions, please contact me.

Very truly yours,

I,_____   /s/ W. Rodriguez
acknowledge that I have received a   W. Rodriguez
copy of the DOE PMPA Summary   Manager – Retail
with this letter.   Marketing
Date _____, 19__