## CALIFORNIA PETROLEUM DISTRIBUTORS INC., Plaintiff,

### v.

## CHEVRON U.S.A. INC., Defendant.

### No. CV 84–1276.

United States District Court,
E.D. New York.

May 31, 1984.

Carl S. Levine, P.C., Garden City, N.Y., for plaintiff.

Cravath, Swaine & Moore, by Max R. Shulman, New York City, for defendant.

## MEMORANDUM AND ORDER

WEXLER, District Judge.

Plaintiff brings this action pursuant to the franchise protection provisions of the Petroleum Marketing Practices Act (PMPA or the Act), 15 U.S.C. Sections 2801 to 2806. Plaintiff California Petroleum Distributors, Inc. (California Petroleum) seeks to enjoin defendant Chevron U.S.A., Inc. (Chevron)

from terminating their franchise contract, alleging that Chevron failed to give the notice required under the PMPA.

I.

California Petroleum is termed a motor fuels jobber by its contract with Chevron. Under the PMPA it is a distributor franchisee, purchasing Chevron branded petroleum products and distributing them in Kings, Queens, Nassau and Suffolk counties. 15 U.S.C. Section 2801(4) and (6). Plaintiff sells the Chevron brand products directly to the public through its own retail outlets and sells to independent retailers authorized to resell under the Chevron brand. California Petroleum also distributes other branded and unbranded petroleum products and is not the exclusive distributor of Chevron products in the area.

Chevron is a major refiner of petroleum products. It is a wholly-owned subsidiary of Standard Oil Company of California and under the PMPA it is a refiner and distributor franchisor, 15 U.S.C. Section 2801(3) and (5). Chevron and California Petroleum have had a franchise relationship for thirty-six years. The Byrnes family has owned California Petroleum for the last twenty-five years. The current franchise contract runs from April 1, 1983 to March 31, 1986.

From mid-1982 to July 26, 1983 Chevron's terms of credit to California Petroleum were 1% ten days, the net due eleven days from the billing date with a $1.2 million line of credit, or limit to California Petroleum's indebtedness. This altered the previous terms of 1% ten days, net due in thirty days. In July 1983 Chevron received and reviewed California Petroleum's 1982 financial statement. That statement showed a marked weakening of California Petroleum's financial standing, with a $1.03 million loss, cash on hand falling more than 75% to $233,000.00, working capital falling to a deficit of almost $1 million, and net worth slipping from $1.7 million to $1.1 million at the end of 1982. This prompted Chevron to meet with California Petroleum and reduce its credit line by half. Thus began a downward spiral of financial assessments followed by cuts in California Petroleum's credit line and demands for reduced indebtedness by Chevron. In October 1983 California Petroleum's first two quarters of 1983 showed continuing deterioration and the credit line was halved again.

As California Petroleum then owed Chevron about $640,000.00, this reduction put it some $340,000.00 over its line of credit. No arrangement could be reached to increase the credit or reduce the debt and at the end of October 1983 Chevron required that plaintiff pay cash before delivery of any products. Thereafter, plaintiff and defendant met a number of times to discuss paying off the balance owed by California Petroleum. Chevron asked for personal guarantees from the Byrnes family in order to restore credit. The Byrnes demurred for reasons that are unclear. A schedule for repayment was discussed, also apparently without firm agreement. Meanwhile California Petroleum made payments that brought the debt down to somewhere between $250,000.00 and $350,000.00 at the end of February 1984.[1]

At a meeting at the end of February it became clear to Chevron that it was not going to get the payment schedule, the debt guarantees, or security it wanted. California Petroleum was making payments either by oral agreement or on its own initiative at a rate of $20,000.00 plus interest per month. In any case, by this time at least $250,000.00 was due and owing since October 1983 (Affidavit of Carl

---

1. The parties do not agree on exact figures for the debt, but at no point is the difference between their numbers of real significance to the motion for a preliminary injunction. According to the affidavit of Robert Ollwerther submitted in support of defendant's opposition, on February 23, 1984 California Petroleum owed Chevron about $341,000.00, and on March 12, 1984 they owed about $290,000.00. The affidavit of William Byrnes submitted in support of the motion for a preliminary injunction, states that in January 1984 the debt to Chevron was something less than $300,000.00, and on March 27, 1984 it was about $250,000.00. In no event could the debt be termed minor or substantially paid off.

Levine in Support of Plaintiff's Motion, para. 34). At this juncture California Petroleum's third quarter 1983 financial statement came to Chevron's hands. It showed a further worsening of California Petroleum's financial position.

On March 12, 1984 Chevron gave written notice that it was terminating California Petroleum's franchise effective March 28, 1984, unless full payment of the outstanding debt was made in ten days. Chevron's letter asserted that there were defaults on the franchise agreement for non-payment of $290,000.00 and trademark violations. Chevron clarified its position a few days later by letter, stating that termination was based solely on payment default. On March 27, 1984, plaintiff commenced this action, asking for injunctive relief.

In their first appearance before this Court the parties agreed to continue under the terms of the franchise agreement and entered into negotiation on payment of the approximately $250,000.00 still owed to Chevron, including a payment schedule and guarantees or security. Proceedings on plaintiff's motion were stayed. After a month of negotiation it became clear that plaintiff could not offer to Chevron enough in unencumbered assets or available personal guarantees to substantially secure the outstanding debt. On April 26, 1984 both parties asked the Court to proceed and render a decision on plaintiff's motion for a preliminary injunction. The Court notes that no substantial evidence has been presented on trademark violation. In view of the fact that Chevron based its termination solely on the payment default and the dispute in the proceedings before the Court has only addressed the debt issue, the Court does not consider the allegations of trademark violation to be at issue.

## II.

The PMPA has as its benign purpose "the protection of franchised distributors and retailers of motor fuels." S.Rep.No. 95–731, 95th Cong., 2d Sess. 1, *reprinted in* 1978 U.S.Code Cong. & Ad.News 873. The Act particularly prohibits discriminatory or arbitrary termination of a petroleum franchise. *Id.* at 15, *reprinted at* 874. Of notable concern to Congress was the imbalance of power in favor of refiners and franchisors in the making, modifying, renewal and termination of contracts with franchisees. *Id.* at 17–18, *reprinted at* 875–76. Congress chose to remedy the inequality by setting out certain requirements for termination or nonrenewal of a franchise, among which were time requirements. 15 U.S.C. Section 2802.

In keeping with the purposes of the PMPA the Congress enacted an enforcement section that provided for the grant of a preliminary injunction by the federal courts on a somewhat lesser showing of cause than is usual for such equitable relief. 15 U.S.C. Section 2805(b)(2). Specifically, the franchisee need only show termination of his franchise and "sufficiently serious questions going to the merits to make such questions a fair ground for litigation." 15 U.S.C. Section 2805(b)(2)(A)(i) and (ii). In addition, the Court must determine that the balance of hardships caused by granting the injunction weighs less heavily on the franchisor than denial would weigh on the franchisee. 15 U.S.C. Section 2805(b)(2)(B).

■ Nevertheless, the PMPA does not entirely forbid termination or nonrenewal of a franchise agreement. In fact, the grounds for termination or nonrenewal provided in Section 2802 are wide ranging. Rather, the PMPA seeks to make termination and nonrenewal less arbitrary and allow time in which to act to preserve the franchise by imposing certain notice and time requirements on termination or nonrenewal. Specifically, the statute provides in relevant part:

> (a) Prior to termination of any franchise or nonrenewal of any franchise relationship, the franchisor shall furnish notification of such termination or such nonrenewal to the franchisee who is a party to such franchise or such franchise relationship—
> (1) in the manner described in subsection (c) of this section; and

(2) except as provided in subsection (b) of this section, not less than 90 days prior to the date on which such termination or nonrenewal takes effect.

(b)(1) In circumstances in which it would not be reasonable for the franchisor to furnish notification, not less than 90 days prior to the date of which termination or nonrenewal takes effect, as required by subsection (a)(2) of this section—

(A) such franchisor shall furnish notification to the franchisee affected thereby on the earliest date on which furnishing of such notification is reasonably practicable; ...

(c) Notification under this section—

(1) shall be in writing;

(2) shall be posted by certified mail or personally delivered to the franchisee; and

(3) shall contain—

(A) a statement of intention to terminate the franchise or not to renew the franchise relationship together with the reasons therefor;

(B) the date on which such termination or nonrenewal takes effect; ....

15 U.S.C. Section 2804.

Of particular importance to this case are those provisions of the PMPA outlining grounds for termination. In relevant part Section 2802 of the Act provides:

(b)(1) Any franchisor may terminate any franchise ..., if—

(A) the notification requirements of section 2804 of this title are met; and

(B) such termination is based upon a ground described in paragraph (2) ....

15 U.S.C. Section 2802. Paragraph 2 of the section then provides in pertinent part:

(2) for purposes of this subsection, the following are grounds for termination of a franchise...:

    *     *     *     *     *     *

(C) The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable, if

such event occurs during the period the franchise is in effect and the franchise first acquired actual or constructive knowledge of such occurrence—

(i) not more than 120 days prior to the date on which notification of termination or nonrenewal is given, if notification is given pursuant to section 2804(a) of this title; or

(ii) not more than 60 days prior to the date on which notification of termination or nonrenewal is given, if less than 90 days notification is given pursuant to section 2804(b)(1) of this title.

Further on Section 2802 declares:

(c) As used in subsection (b)(2)(C) of this section, the term "an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable" includes events such as—

   *     *     *     *     *     *

(8) failure by the franchise to pay to the franchisor in a timely manner when due all sums to which the franchisor is legally entitled.

In sum, if Chevron gives proper written notice, satisfies the time requirements, and has good grounds for termination it can end the franchise agreement. Termination that fails to comply with the PMPA gives California Petroleum ground for a civil action, 15 U.S.C. Section 2805(a), and injunctive relief, 15 U.S.C. Section 2805(b).

### III.

■ Under the injunctive remedy provision of Section 2805 California Petroleum must show that its franchise with Chevron is terminated and that there is a serious question going to the merits that is a fair ground for litigation. 15 U.S.C. Section 2805(b)(2)(A). It is clear that but for the commencement of this action and the willingness of Chevron to maintain the *status quo* pending the outcome of the instant motion the franchise would have been terminated on March 28th. Furthermore, Chevron will cease to supply California Pe-

troleum if the request for a preliminary injunction is denied by this Court. Therefore, it is apparent that the first element necessary to support a preliminary injunction, that is termination, is present. As to the second element, the plaintiff must show that there is a sufficiently serious question on the merits constituting a fair ground for litigation. This goes to the substance and form of the termination.

At issue is whether Chevron conformed to the requirements of the PMPA when it gave notice of termination of the franchise in March 1984. California Petroleum contends that it did not violate the franchise agreement in any way. Alternatively, plaintiff contends that if there was a payment default Chevron waived it as a ground for termination under the terms of the PMPA by its failure to act on it within the prescribed time period. If the termination was in conformance with the PMPA, as Chevron argues, there is no sufficiently serious question going to the merits and forming a fair ground for litigation and therefore no basis for a preliminary injunction under Section 2805.

■ Assuming a valid ground, under Section 2804(a) Chevron could terminate the franchise contract by giving ninety days notice. Alternatively, Chevron could terminate with less than ninety days notice under Section 2804(b)(1) if under the circumstances ninety days would not be reasonable. The basic ground for termination is "[t]he occurrence of an event which is relevant to the franchise and as a result of which termination of the franchise relationship ... is reasonable." 15 U.S.C. Section 2802(b)(2)(C). Among the enumerated events that can trigger termination is failure to pay the franchisor all sums legally due in a timely manner. 15 U.S.C. Section 2802(c)(8). Whether Chevron must give ninety days notice, can give the sixteen days notice it gave, or has waived its ground for termination altogether depends on the interpretation of the knowledge time limit of Section 2802(b)(2)(C). Reading that subsection in conjunction with Section 2804, the acquisition of constructive or actual knowledge of an occurrence that justifies termination must be acted on within 120 days if ninety days termination notice is given and within sixty days if less than ninety days termination notice is given. 15 U.S.C. Section 2802(b)(2)(C), Section 2804(a) and (b)(1). Thus, a franchisor is barred from using stale events or violations to which it has acquiesced as later grounds for termination of the franchise. In this way the PMPA codifies an estoppel principle.

California Petroleum contends that if there was a payment default it occurred and was known to Chevron at the end of October 1983, when Chevron required cash before delivery from plaintiff and cut the company's credit. This date puts the March 1984 notice outside the 120 day limit for exercising termination under the terms of the PMPA. Moreover, California Petroleum correctly asserts that since Chevron gave less than ninety days notice of termination it placed itself under the Section 2802(b)(2)(C)(ii) sixty day limit. Chevron does not seriously argue the applicability of the sixty day as opposed to the 120 day limit. Rather, Chevron contests whether the time limit has run at all, claiming that the continuing nature of the payment default vitiates any argument of time bar.

The case law in this circuit on the question of the ongoing nature of a franchise violation is limited but instructive. In *Kajdan v. Exxon Co., U.S.A.*, 1980–1 Trade Cas. (CCH) paragraph 963, 262 (D.Conn. March 14, 1980), the district court held the failure of a gas station franchisee to pay rent for four months over a ten month period a "continuing non-compliance" that extended beyond the first due date for rental payment. *Id.* at paragraph 78, 305. The court called each failure to make payment after a franchisor complaint a repeat of the default. *Id.* Similarly, in *Escobar v. Mobile Oil Corp.* the district court again declared that ongoing violations or defaults of the franchise are separate occurrences of noncompliance. 522 F.Supp. 593, 602 (D.Conn.1981), *rev'd on other grounds*, 678 F.2d 398 (2d Cir.1982). This principle of

continuing defaults not falling within the PMPA time bar has also been recognized in the analogous "dirty station" cases in other circuits. *E.g.*, *Gruber v. Mobile Oil Corp.*, 570 F.Supp. 1088 (E.D.Mich.1983); *Walters v. Chevron U.S.A., Inc.*, 476 F.Supp. 353 (N.D.Ga.1979).

Recently, the Second Circuit Court of Appeals endorsed this approach to ongoing franchise violations in *Wisser Co., Inc. v. Mobile Oil Corp.*, 730 F.2d 54 (2d Cir.1984). There the Court of Appeals pointed to the legislative intent of Congress, which stated that while the PMPA is intended to erect a time bar to termination based on "old and long forgotten events," the time limitations are not intended to preclude a franchisor from exercising termination rights based on events that are repeat occurrences of previously waived franchise violations. S.Rep. No. 95–731, 95th Cong., 2d Sess. 33–34, *reprinted in* 1978 U.S. Code Cong. & Ad.News 892.

■ This Court concludes that California Petroleum's failure to pay amounts past due constitutes an ongoing default directly analogous to the failure to pay back rent in *Kadjan*. Moreover, each of Chevron's repeated unsuccessful efforts to negotiate payment or a guarantee of the outstanding balance on California Petroleum's account, gave rise to a new event of noncompliance. That Chevron spent four months actively trying to preserve the franchise agreement should not be used against it now. To hold otherwise would force franchisors to act quickly and only with a view to protecting their rights under the PMPA rather than effectuating the Act's core purpose of preserving the franchise relationship. This Court refuses to read the provisions of the PMPA in a manner that would make it a shield for bad faith negotiations by franchisees.

Accordingly, the Court finds that California Petroleum's payment default was not time barred by the PMPA as a ground for termination. The default was both an ongoing violation of the franchise and by each refusal to come to payment terms a repeated occurrence of an event that breached the agreement. That Chevron did not act precipitously and continued to negotiate the payment problem from November through February does not waive the default. The Court finds that when Chevron gave sixteen days notice in mid-March it met the time limits of the PMPA. 15 U.S.C. Section 2802(b)(2)(C)(i). Under the most restrictive application of the statute California Petroleum repeated its payment default anew when at the February 24, 1984 meeting with Chevron it could give neither payment nor guarantee for the roughly quarter of a million dollars it owed. Quite clearly the mid-March notice was within the sixty day requirement for less than ninety days notice. 15 U.S.C. Section 2802(b)(2)(C)(ii).

## IV.

■ California Petroleum claims that nonpayment was not a default, but an impossibility or a matter "beyond the reasonable control of the franchisee", which is not a "failure" to pay under the PMPA. 15 U.S.C. Section 2801(13)(B). The Court will not stretch either the meaning of the PMPA or principles of contract law to shield plain, ordinary failure to pay a debt for shortage of cash. That the PMPA specifically provides that nonpayment is a violation of the franchise agreement and ground for termination destroys any contention that nonpayment should be construed as matter beyond the franchisee's control. 15 U.S.C. Section 2802(c)(8).

■ California Petroleum also claims that failure to pay up is not a sufficiently serious event to constitute a violation of the franchise agreement under the PMPA. Reasoning from the less concrete wording of subsection 2802(b)(2)(A), which speaks to failure to comply with a "reasonable" franchise provision of "material significance," plaintiff argues that failure to fully pay outstanding debt did not violate a reasonable and materially significant term of the franchise. Again, this argument ignores the Section 2802(b)(2)(C) ground for termination which in conjunction with Section 2802(c)(8) specifically declares that "failure

by the franchisee to pay to the franchisor in a timely manner when due all sums to which the franchisor is legally entitled" is an event relevant to the franchise relationship and a "reasonable" basis for termination. California Petroleum's default fits squarely within this statutory provision.

■ Next, plaintiff contends that defendant's termination notice did not meet PMPA requirements under Section 2804(c). This contention is not credible. Plaintiff received written notice by hand delivery on March 12, 1984 with a date certain for termination and the required summary of the PMPA. 15 U.S.C. Section 2804(c)(1),(2),(3)(A)–(C). As the Court reads the letter the statement of reason for the termination is plainly payment default.[2] The letter also contained a request that plaintiff pay the debt to preserve the franchise. By a letter dated March 13, 1984 and sent by certified mail, Chevron made clear that payment default was the reason for termination, apparently abandoning any trademark violation ground for termination. The Court determines, therefore, that the notice conformed to PMPA requirements.

■ Finally, plaintiff claims that sixteen days notice is not reasonable under the PMPA. 15 U.S.C. Section 2804(b)(1). Pointing to the case of *The Vermont Morgan Corp. v. Chevron U.S.A., Inc.,* No. CV 82–289, slip op. (D.Vt., Nov. 12, 1982), plaintiff argues that thirty days notice is the correct interpretation of reasonable notice. Reliance on that case is inapposite. The *Vermont Morgan* court found violations of the notice requirements of the PMPA and issued an injunction that, as one condition, required thirty days notice for termination. The Court finds the relief fashioned peculiar to the facts in that case and not a conclusion of law applicable here. Under the facts in this case the Court finds

nothing unreasonable in sixteen days notice following four months of demands for payment.

### V.

In conclusion, the Court finds that plaintiff has not shown a question of sufficient substance going to the merits as required for the grant of a preliminary injunction under the PMPA. 15 U.S.C. Section 2805(b)(2)(A)(ii). It is apparent that the termination was consistent with the purpose and letter of the law. The written notice requirement was met in all respects and the ground for termination is squarely within the provisions of the PMPA. The Court finds that the continuing and repeated events of default were such that defendant acted within the required sixty day time limit and was allowed by the PMPA to give less than ninety days notice of termination. Finally, in view of the preceeding period of payment discussions there is nothing unreasonable in the sixteen days notice given. Therefore, there is no issue, much less an issue of substance, that is fair ground for litigation.

Accordingly, plaintiff's motion for a preliminary injunction pursuant to 15 U.S.C. Section 2805(b)(2) is hereby denied.

SO ORDERED.

---

**2.** The letter, produced as Plaintiff's Exhibit 4, states:

Due to your failure to pay the product balance which is past due, Chevron hereby elects to terminate and not renew our Branded Jobber Petroleum Products Agreement and related agreements and declares the same terminated effective March 28, 1984 unless you cure the default with respect to non-payment in full within ten (10) days after you receive this letter.