MARATHON PETROLEUM
COMPANY, Plaintiff,

v.

Guy R. PENDLETON, Defendant.

No. C86–2340A.

United States District Court,
N.D. Ohio, E.D.

May 16, 1988.

Robert Weller, Susan Haller, Jones, Day, Reavis & Pogue, Cleveland, Ohio, for plaintiff.

James Burke, Jr., Hart, Rawlings & Burke, Akron, Ohio, for defendant.

## MEMORANDUM OPINION

DOWD, District Judge.

### I. INTRODUCTION.

On April 24, 1986 Marathon Petroleum Company ("Marathon") terminated Guy Pendleton's ("Pendleton") franchise on ten day notice rather than ninety day because of Pendleton's failure to pay monies due Marathon and because Pendleton allowed his station to deteriorate in appearance and performance. Initially Pendleton refused to vacate, and on May 30, 1986 Marathon brought this action seeking a declaratory judgment and money damages against Pendleton. Marathon invoked this Court's jurisdiction pursuant to the Petroleum Marketing Practices Act, ("PMPA"), 15 U.S.C. §§ 2801–2806.

### II. PROCEDURAL HISTORY.

Marathon's complaint raises three separate causes of action. The first cause of action seeks a declaration that Marathon's notice of intent to terminate the franchise complied with the PMPA and that Marathon's termination of Pendleton's franchise was lawful under the PMPA. Marathon also seeks the return of the premises unlawfully occupied by Pendleton in count one. The second cause of action seeks attorney's fees under the PMPA as a result of Marathon's need to institute the present action. The third cause of action seeks to recover the amount due on a promissory note between Marathon and Pendleton.

Pendleton filed an answer to the complaint and filed a counterclaim alleging that Marathon's termination constituted a malicious interference with a proposed agreement between Pendleton and a third party for the sale of the station. Pendleton claims that he was negotiating the sale of the station when Marathon terminated his franchise and that Marathon's termination was designed to prevent the sale.

On November 21, 1986 Marathon moved the Court for summary judgment on all three counts of its complaint and on Pendleton's counterclaim. Pendleton opposed the motion and sought leave of court to file an amended complaint adding additional claims to his original counterclaim.

The Court denied Marathon's motion for summary judgment on counts two and three of the complaint and Pendleton's counterclaim. With respect to count one of Marathon's complaint, the Court found that Marathon had a basis for the termination of the franchise under the PMPA as a matter of law. However, the Court found that summary judgment was inappropriate because there was a material issue of fact as to whether the notice requirement under the PMPA had been sufficiently complied with. Thus, the Court proceeded to trial on the issue of whether Marathon had given proper notice of termination under the PMPA. The Court denied Marathon's motion on Pendleton's counterclaim finding facts in dispute on that claim.

The Court also denied Pendleton's motion for leave to file an amended counterclaim. Pendleton had sought leave to add, among other claims, a counterclaim for wrongful termination under the PMPA. Pendleton's amended counterclaim, in the Court's view, alleged that Marathon's reason for terminating the franchise was an improper basis for termination under the PMPA. Thus, the Court denied the motion for leave to add an amended claim because it had already determined "that Marathon may terminate a lease for franchise agreement for failure to pay in a timely manner sums due to Marathon, and that the PMPA does not

authorize the Court to investigate the reasonableness of termination based upon a statutorily prescribed events." March 10, 1987 Memorandum Opinion p. 14.

Thereafter, Pendleton moved the Court to reconsider its decision to deny him leave to file an amended counterclaim. Pendleton argued that the Court had "misconstrued the allegations in the counterclaim and that the defendant really intended to raise claims relating to whether Marathon acted reasonably in providing only 10 days notice prior to terminating the franchise." September 3, 1987 Order, p. 2. The Court, however, concluded that

> [a]lthough the defendant mentioned in passing the fact that Marathon only provided 10 days notice before terminating its franchise, the clear gist of the plaintiff's counterclaim, entitled "wrongful termination of franchise," is that Marathon acted unreasonably when it terminated the franchise because of the defendant's failure to make timely rent payments and other payments. *The defendants' counterclaim cannot be reasonably interpreted to raise the issue of the 10 day notice.*

September 3, 1987 Order, p. 2–3 (emphasis added).

On October 21, 1987 the Court entered an order bifurcating the case and proceeded with the plaintiff's claims before the Court while delaying the resolution of the defendant's counterclaim until such time that a jury could be seated. The Court conducted a trial on Marathon's claim against Pendleton on November 4 and 5, 1987.

At the conclusion of both parties' case in chief, each party made a motion to amend the pleadings to conform to the evidence. Transcript of Proceedings, Vol. II, pp. 369–70. The plaintiff expanded on the basis for its motion in its post-trial brief and asserts that leave should be permitted to file an amended counterclaim asserting a wrongful termination under the PMPA for the failure of Marathon to give adequate notice of termination.

## III. THE PMPA FRAMEWORK.

Sections 2801 through 2806 of the PMPA appear in the United States Code under the subchapter entitled Franchise Protection. It is clear that this chapter of the PMPA was designed to protect franchisees from arbitrary and discriminatory termination or nonrenewal of franchises by the franchisors for failure to comply with the marketing policies of the franchisor. *Wisser Co., Inc., v. Mobil Oil Corp.*, 730 F.2d 54 (2d Cir.1984); *Kostantas v. Exxon Co., U.S.A.*, 663 F.2d 605 (5th Cir.), *cert. denied*, 456 U.S. 1009, 102 S.Ct. 2302, 73 L.Ed.2d 1305 (1982); *Marks v. Shell Oil Co.*, 643 F.Supp. 1050 (E.D.Mich.1986).

Section 2802 establishes the general guidelines for the relationship between the franchisee and the franchisor. Under § 2801(b)(1)

> [a]ny franchisor may terminate any franchise ... or may fail to renew any franchise relationship, if—(A) the notification requirements of sections 2804 of this title are met; *and* (B) such termination is based upon a ground described in paragraph (2) or such nonrenewal is based upon a ground described in paragraph (2) or (3).

15 U.S.C. § 2802(b)(1) (emphasis added). A lawful termination requires proper notice and a proper ground for termination under § 2802. "If a franchisor fails to comply with the requirements of section 2802 or 2803 ..., the franchisee may maintain a civil action against such franchisor." 15 U.S.C. § 2805(a). Section 2805 further provides that a successful franchisee in an action under § 2805(a) is entitled to actual damages, exemplary damages in cases of willful disregard of requirements of 2802 or 2803, and reasonable attorney fees. 15 U.S.C. § 2805(d)(1)(A), (B), and (C).

The majority of the cases under the PMPA are brought by the franchisee against the franchisor for wrongful termination of the franchise agreement. Often, the franchisee may bring an action for preliminary injunction to enjoin the franchisor from wrongfully terminating the franchise agreement. *See, e.g., Barnes v. Gulf Oil Corp.*, 824 F.2d 300 (4th Cir.1987). It also

appears that a franchisor may bring an action against the franchisee to terminate the franchise agreement notwithstanding any express provision for an action by the franchisor against the franchisee under the PMPA. *See, e.g., Amoco Oil Co. v. D.Z. Enterprises, Inc.,* 607 F.Supp. 595 (E.D.N.Y.1985); *Shell Oil Co. v. Kozub,* 574 F.Supp. 114 (N.D.Ohio 1983); *Exxon Corp. v. Miro,* 555 F.Supp. 234 (C.D.Cal.1983); *Crown Central Petroleum Corp. v. Waldman,* 515 F.Supp. 477 (M.D.Penn.1981).

## IV. MOTION FOR LEAVE TO AMEND THE PLEADINGS TO CONFORM TO THE EVIDENCE.

The Court finds that Pendleton's motion for leave to amend the pleadings to conform to the evidence is well taken.[1]

■ At trial, each party presented substantial evidence on the issue of whether the notice provided by Marathon to Pendleton was within the requirements of the PMPA. Further, Pendleton's entire defense was presented as a wrongful termination case under the PMPA. Notwithstanding the Court's twice denial of Pendleton's leave to file a counterclaim for wrongful termination under the PMPA, it is quite clear to the Court that Pendleton's proposed amended counterclaim is for wrongful termination under the PMPA because of an alleged defect in the notice given by Marathon. Further, should the Court determine that the notice was improper, Pendleton would necessarily have a claim for wrongful termination because § 2802 requires both proper notice and a proper ground for termination before the franchisor can terminate the franchise.

■ The Court also finds that leave for Pendleton to amend its pleadings to conform to the evidence is necessary for the Court's continuing jurisdiction over this case.

The plaintiff's first cause of action seeks a declaratory judgment that its termination of the plaintiff's franchise was legally effective, that the notice of intent to terminate the lease complied with the requirements of the PMPA, and the restoration of the lease marketing premises to Marathon. Subsequent to the Marathon's motion for summary judgment, Pendleton vacated the premises on or about August 1, 1986. The Court's ruling on Marathon's motion for summary judgment resolved the legality of Marathon's termination and found that as a matter of law Marathon had a permissible basis for its termination. The only issue, therefore, left unresolved under count one of Marathon's complaint is whether the notice to terminate complied with the requirements of the PMPA.

As the case now stands, for the Court to determine whether the notice supplied to Pendleton by Marathon complied with the PMPA, is of no consequence. Once the dealership was returned to the franchisor, the controversy between the parties under count one ceased. Any determination that Marathon is entitled to a declaratory judgment that its actions were lawful does not give Marathon any basis for damages under the PMPA. The PMPA speaks only to damages for a successful franchisee. 15 U.S.C. § 2805(a). Essentially, there is no controversy between Marathon and Pendleton regarding the legitimacy of its notice under the PMPA because Marathon has secured the relief it sought in count one of the complaint.[2] The only relevance that a

1. Marathon also moved the Court for leave to amend the pleadings to conform to the evidence. The Court, however, finds that Marathon has failed to articulate the basis for the motion, or the amendment proposed. Accordingly, Marathon's motion for leave to amend the pleadings to conform to the evidence is denied.

2. This case is distinguished from the cases cited in section III of this opinion as support for the proposition that courts have entertained suits brought by the franchisor against the franchisee. In *Amoco Oil Co. v. D.Z. Enterprises,*

*Inc.,* 607 F.Supp. 595 (E.D.N.Y.1985), the franchisee remained as an operator of the station and Amoco's suit sought the termination of the franchise agreement and the renewal of the franchise. In *Shell Oil Co. v. Kozub,* 574 F.Supp. 114 (N.D.Ohio 1983), the franchisor brought a suit to terminate the franchise agreement when the dealer refused to vacate the premises on notification of termination. Similarly, in *Crown Central Petroleum Corp. v. Waldman,* 515 F.Supp. 477 (M.D.Penn.1981), the franchisor brought a suit seeking to terminate the franchise agreement when the franchisee

notice decision has between the two parties in this case is presumably as a defense for Marathon against Pendleton's claim for malicious interference with any alleged sale of the dealership. In comparison, the notice issue is crucial to Pendleton's counterclaim for wrongful termination under the PMPA.

Accordingly, the Court finds that the plaintiff's motion for leave to amend the pleadings to conform to the evidence is granted. The Court finds that Pendleton's wrongful termination claim was tried by implied consent of the parties. Further, the Court finds that leave is necessary to the continuing jurisdiction of this Court. The plaintiff is hereby granted leave to file an amended counterclaim alleging wrongful termination under the PMPA.

## V. RESOLUTION OF THE NOTICE ISSUE.

As a general rule the PMPA requires a franchisor to give ninety day notice of termination to a franchisee prior to a termination of the franchise or a nonrenewal of the franchise. 15 U.S.C. § 2804(a)(1) and (2). However, "[i]n circumstances in which it would not be reasonable for the franchisor to furnish notification, not less than 90 days prior to the date on which termination or nonrenewal takes effect.... Such franchisor shall furnish notification to the franchisee affected thereby on the earliest date on which furnishing of such notification is reasonably practicable." 15 U.S.C. § 2804(b)(1). The notification must be in writing, posted by certified mail or personally delivered to the franchisee, and contain "a statement of intention to terminate the franchise or not to renew the franchise relationship, together with the reasons therefore," "the date on which such termination or nonrenewal takes effect," and "the summary statement prepared under subsection (d) of section [2804]." 15 U.S.C. § 2804(c).

The narrow issue presented here is whether Marathon was entitled, under the circumstances, to terminate the franchise relationship in less than ninety days. The question is whether the circumstances of this case excuse the requirement of the ninety day notice. The secondary question is whether the notice of ten days was reasonable.

The termination notice sent by Marathon to Mr. Pendleton on April 24, 1986 provided:

Dear Mr. Pendleton:

Please be advised that the Service Station Lease between you and Marathon Petroleum Company, effective as of December 30, 1983, and Marathon's relationship with you, are hereby terminated. The effective date of this termination is ten (10) days from the date you receive this notice of termination.

There are two (2) reasons for this termination the first of which is your failure to pay to Marathon in a timely manner all sums to which it is legally entitled. At the present time you have an account balance of $21,709.80, of which $7,774.17 is delinquent and includes the unpaid rent for the months of March and April, 1986. The failure to pay on your part for the months of March and April, 1986. The failure to pay on your part constitutes the occurrence of an event which is relevant to our relationship and which makes termination both reasonable and permissible under Section 102(b)(2)(C) of the Petroleum Marketing Practices Act (the "Act").

The second reason for this termination is your failure to comply with Sections 3 and 6(a)(iii)(B) of the Service Station Lease. These sections of the Service Station Lease are both reasonable and of material significance to our relationship. The breach of these provisions, therefore, constitutes grounds for termination of the Service Station Lease pursuant to Section (102)(b)(2)(A) of the Act.

---

remained in the station. In *Exxon Corp. v. Miro,* 555 F.Supp. 234 (C.D.Cal.1983), the franchisor did bring a declaratory judgment action seeking the decision of whether its termination

was rightful. The Court did not raise the propriety of ruling on the declaratory judgment action notwithstanding the fact that it recognized that the issues in the case were moot.

Finally, we enclose with this notice of termination a copy of the Summary of Title I of the Act, as prepared by the Secretary of Energy, in accordance with Section 104(c)(3)(C) of the Act.

Sincerely,

/s/ ESMa

ESM/ss

Enclosure

bxc: G.A. Risser

     K.G. Nowe

Initially, it is clear that Marathon's manner and form of notification under 15 U.S.C. § 2804(c) was sufficient. The notice was in writing, it was posted by certified mail, it contained an intention to terminate franchise and gave the reasons for the termination,[3] it specified the date on which the termination would take effect, and contained a summary statement in conformance with 15 U.S.C. § 2804(d).

The Court now turns to the question of whether Marathon acted reasonably in terminating Pendleton's franchise with less than ninety days under the circumstances of this case.

■ Although § 2804(b) provides for less than ninety days notice of termination "[i]n circumstances which would not be reasonable for the franchisor to furnish notification," the PMPA does not provide any guidelines for determinating what circumstances give rise to less than ninety day notice. A review of the few cases addressing the notice issue, however, makes it clear to the Court that a determination of reasonableness is one that is done on a case by case basis under the circumstances of each particular case. *Wisser Co., Inc. v. Mobil Oil Corp.*, 730 F.2d 54 (2d Cir.1984); *California Petroleum Distributors v. Chevron U.S.A.*, 589 F.Supp. 282 (E.D.N.Y. 1984); *Loomis v. Gulf Oil Corp.*, 567 F.Supp. 591 (M.D.Fla.1983); *Amadeo v. Mobil Oil Caribe, Inc.*, 642 F.Supp. 962 (D. Puerto Rico 1986).

In *Wisser Co., Inc. v. Mobil Oil Corp.*, 730 F.2d 54 (2d Cir.1984), the franchisor terminated the franchisee's franchise with

immediate notice of termination. The franchisee was engaged in the misbranding of gasoline, passing out non-Mobil gasoline as a Mobil product. The Second Circuit Court of Appeals looked to the legislative history of the PMPA and recognized that while prior drafts of the PMPA required ninety-day notice of termination in all cases, "[t]he legislative history and hearings, ... indicate that § 2804(b)(1)(A) was added to dispense with the lengthy notice requirement where, for example, a franchisee committed serious defaults of the franchise agreement, such as misbranding." *Wisser*, 730 F.2d at 60. The court cited to Senate Bill 323, the predecessor to the PMPA § 2804(b), which specifically identified misbranding as a circumstance warranting less than ninety-day notice. *Id.* The court concluded that Mobil was justified in taking the immediate steps given the gravity of the franchisee's actions. The court found that "[w]ere Mobil required to wait 90 days or some shorter period between notice and the effective date of termination, there is no reason to believe that Wisser [franchisee] would not have used the time to continue its alleged misbranding to its profit." *Wisser*, 730 F.2d at 60.

In *California Petroleum Distributors v. Chevron U.S.A.*, 589 F.Supp. 282 (E.D.N.Y. 1984), the district court found that sixteen days notice of termination under the circumstances in that case was reasonable. California Petroleum Distributors, Inc., the franchisee accumulated a substantial debt exceeding its credit line with the franchisor. The franchisor changed its credit terms with the franchisee on at least two occasions prior to requiring payment of cash before delivery of any products. At the end of February, 1984, the debt of the franchisee was somewhere between $250,-000 and $350,000, down from a high of around $640,000. The franchisor and the franchisee met a number of times in an attempt to work out an arrangement so that the debt could be resolved. However, no agreement was reached. In March, 1984 the franchisor gave notice that it was

---

**3.** The Court has already determined that Marathon had a basis for terminating the franchise,

and that issue is not before the Court. *See* March 10, 1987 Memorandum Opinion.

terminating the franchisee's franchise unless full payment was made within ten days of the notice. The court summarily concluded that "[u]nder the facts in this case the Court finds nothing unreasonable in sixteen days notice following four months of demands for payment." *California Petroleum Distributors*, 589 F.Supp. at 289.

In *Loomis v. Gulf Oil Corp.*, 567 F.Supp. 591 (M.D.Fla.1983), Loomis, the franchisee, had a history of financial problems over the life of the franchise relationship. *Loomis*, 567 F.Supp. at 596. By October 18, 1982, Loomis had incurred a debt of approximately $56,000. Loomis met with Gulf Oil representatives and agreed to make a minimum payment of $35,000 prior to October 21, 1982 with a payment schedule for the balance at the rate of two cents per gallon. The oral agreement entered into on October 18, 1982 was reduced to writing in a letter delivered to Loomis on October 19, 1982. Two days later on October 21, 1982, Gulf advised Loomis that because he had failed to make payment as required by the agreement, the franchise agreement was terminated as of October 21, 1982. Gulf requested that Loomis vacate the premises by October 25, 1982. Loomis remained as a holdover and brought an action against Gulf seeking a preliminary injunction against Gulf alleging a wrongful termination franchise agreement.

The court found that "Gulf acted reasonably in terminating the franchise with less than ninety (90) days notice in the circumstances of this case." *Id.* The Court found that because the franchisee had incurred a debt of $56,233.52 in a period of thirty to sixty days, "[r]equiring Gulf to continue to provide product to Loomis for an additional ninety days would expose Gulf to potential large additional deficiencies for the remainder of the ninety day termination period." *Loomis*, 567 F.Supp. at 597. The Court concluded that "[b]ased on this circumstance alone, it would not be reasonable to require franchisor to continue to do business with franchisee for an additional ninety days after discovery of short for all this magnitude in thirty to sixty day period." *Id.*

In *Amadeo v. Mobil Oil Carbide, Inc.*, 642 F.Supp. 962 (D. Puerto Rico 1986), the district court concluded that thirty day notice of termination was reasonable. Mobil and the franchisee had a one-year agreement by which the franchisee operated a gas station on property leased from a third-party by Mobil. Near the expiration of the one-year agreement, Mobil was informed that the third-party wished to reclaim the property. The landowner gave Mobil thirty days to vacate the property. Mobil then gave the franchisee thirty days notice to vacate the property. The Court concluded that Mobil's notice of thirty days was reasonable under the circumstances. *Amadeo*, 642 F.Supp. at 964.

■ The circumstances in this case warrant Marathon's termination of the franchise agreement on less than ninety days notice.

Pendleton first became a Marathon dealer in 1983 when Marathon purchased Exxon Corporation's interest in Pendleton's service station. Between 1983 and January of 1985, Pendleton developed a delinquent overdue account balance with Marathon. Pendleton claims that prior to January of 1985, he incurred a debt of over approximately $46,000. Pendleton relies on the January 1985 statement of his account as documentation for the claim that the debt was approximately $46,000. Marathon claims that the January 1985 statement while showing an overdue balance of approximately $46,000 is incorrect and the actual amount outstanding in January of 1985 amounted to approximately $17,000. Marathon claims that the January 1985 statement reflects arrearages attributed to gasoline deliveries which were unpaid. When the credits for those unpaid gasoline deliveries were made the $46,000 was reduced to $17,000. Notwithstanding the parties' disagreement over the debt as of January, 1985, it is the Court's finding that as of January 1985, Pendleton was in debt to Marathon for a substantial sum regardless of whether it is $17,000 or $46,000. The amount overdue in January 1985 is not solely dispositive to any issue.

In January of 1985, as a result of Pendleton's delinquent account, Marathon and Pendleton agreed to a payment plan aimed at reducing the total debt. The agreement provided that Pendleton would pay for gasoline deliveries on a load to load basis. A load to load basis required Pendleton to "pay certified funds before his last load of gas before he could get his next load of gas...." Tr. p. 238; Pendleton's Exhibit HH. Previously, Pendleton made his gasoline purchases on credit. Pendleton also agreed to make an additional payment of $250 every time he purchased a new load of gasoline with that money going to reduce the overall debt.

In May of 1985, Pendleton and Marathon reduced their agreement of January 1985 to writing. Between January 1985 and May 1985, Pendleton reduced his overall arrearage to $15,830.72. On May 31, 1985, Pendleton entered into a promissory note for the amount of $15,830.72. Plaintiff's Exhibit 5. The promissory note provided that the sum of $15,830.72, at the interest rate of thirteen percent per year, would be paid, consistent with the January 1985 agreement, in the sum of $250 at the time of each delivery of gasoline until it was paid in full. The promissory note of May 1985 added an additional element to the January 1985 agreement placing a $750 a month maximum on the note payments. From May 31, 1985 until March 27, 1986 Pendleton made the required payments under the note and reduced the total debt to $7,947.18.

In January, 1986, Marathon assigned Pendleton a new marketing representative, Mr. William E. Cramer. It is Pendleton's view that the assignment of Mr. Cramer as Pendleton's marketing representative was the beginning of the end for Mr. Pendleton. It was Mr. Cramer's three-month observation of Pendleton and his recommendation to his superiors that ultimately led to the termination of Pendleton's franchise.

Mr. Cramer testified that when he took over Mr. Pendleton's account from the previous marketing representative he was informed that Pendleton had a credit problem. Tr. p. 25–26. Mr. Cramer met with Mr. Pendleton for the first time in January of 1986 for the purpose of acquainting himself with Mr. Pendleton and giving Mr. Pendleton an opportunity to meet him. Mr. Cramer testified that he discussed the credit problems with Mr. Pendleton and that Mr. Pendleton said that "he [would] be able to get things back in order and get things running up to the operation that he felt he could." Tr. p. 26. Cramer did not discuss any specifics of Mr. Pendleton's credit problems with Marathon.

Mr. Cramer met with Mr. Pendleton again on February 8, 1986. Prior to the meeting on February 8, 1986, Mr. Cramer had an opportunity to review Mr. Pendleton's January 1986 statement. Tr. p. 33. The January 1986 statement reflected an overdue account balance of $3,347.93. Included in the overdue balance was the January rent and the February rent. Mr. Cramer testified that he discussed with Mr. Pendleton the overdue rent and his overdue balance. Tr. p. 33. Mr. Cramer testified that he discussed the note with Pendleton at the February meeting but was unaware, at the time, that Mr. Pendleton was current on the note. Mr. Cramer believed that Pendleton was required to pay $250.00 with each load of gasoline and was unaware that there was a $750.00 maximum payment per month. Tr. 34. At the same time, Cramer does not specifically recall discussing the note with Pendleton. *Id.*

Mr. Cramer met with Mr. Pendleton for a third time on March 18, 1986. Prior to that meeting, Mr. Cramer had an opportunity to review the February statement of Mr. Pendleton's account with Marathon. Tr. p. 38. The February 1986 statement reflected an overdue account balance of $5,630.39, including amounts owed for the February and March rent. Mr. Cramer again discussed with Pendleton the debt and his concern that the station was not improving. Tr. 48. Mr. Cramer suggested that Pendleton consider leaving the station with the possibility of a mutual cancellation of the franchise. *Id.* Pendleton, according to Cramer, was receptive to the idea of a mutual cancellation and told Cramer that a sale of his assets was an option he himself had considered. Tr. at 47. Mr. Cramer

left Pendleton a blank copy of a mutual cancellation for his review. Id. The mutual cancellation was not pursued any further.[4]

The January, February, and March meetings between Pendleton and Marathon were the only three specific meetings between Mr. Cramer and Mr. Pendleton. Tr. pp. 79–80.

Over the three month period of January, February, and March, 1986, Mr. Cramer testified that he observed the condition of Pendleton's station deteriorate to the point that the station reflected poorly on Marathon. Mr. Cramer testified that he did not discuss the condition of the station with Mr. Pendleton in his January 1986 meeting, although the station was "a little messed up." Tr. at 27. However, Mr. Cramer testified that he did discuss the condition of the station with Mr. Pendleton in the February 1986 meeting and after that meeting observed the condition of the station worsen. Tr. at 36. Between the February meeting and the March meeting, Mr. Cramer testified that he observed the station's cleanliness deteriorate to the point where he received reports from other than Pendleton regarding the bathroom facilities. Tr. at 64. Further, Mr. Cramer estimated that he observed at least four occasions when Pendleton's station was out of gasoline. Tr. 38. Mr. Cramer testified that his observations were made on an informal basis because the station was located on the route Mr. Cramer used on his day to day travels. Tr. 37–38. In the March 1986 meeting, Mr. Cramer also discussed the condition of the station with Mr. Pendleton and observed that Mr. Pendleton's attitude regarding the station was "blase."

Mr. Cramer testified that he finally recommended the termination of Mr. Pendleton's franchise based upon his continuing overdue balance, his blase attitude, and the condition of the station. Tr. 62, 63, 64. Mr. Cramer made the recommendation to terminate Pendleton's franchise to his supervisor, Mr. Risser, the district manager for the Ohio and eastern Kentucky district. Mr. Risser, in turn made a recommendation to Mr. Markel, his supervisor, to terminate the franchise. Mr. Risser's recommendation was presented to Mr. Markel in written form and provided in pertinent part:

Mr. Willie Cramer, Marketing Representative, has met with Mr. Pendleton on five different occasions between February 5, 1986, and April 14, 1986. At each of these meetings, the following was discussed:

1) Delinquent rent

2) Delinquent TBA/F purchases

3) Missed payments on his outstanding note.

4) Mr. Pendleton's attitude/desire toward operating this station.

5) Possibility of Bankruptcy.

On or about February 3, 1986, Mr. Pendleton indicated he had tax problems with the IRS as well as other outstanding bills. He further suggested a possible new dealer prospect who was interested in purchasing his equipment and "blue sky". Mr. Cramer interviewed the prospect and determined that he was not the best candidate. Although a Mutual Cancellation was discussed on a couple of occasions, the problem of selling the equipment at an amount necessary to clear debt has been an obstacle preventing execution of this document.

On April 14, Mr. Cramer met with Mr. Pendleton. Pendleton indicated he was receiving advice from his lawyer concerning the Mutual Cancellation or possible bankruptcy. Pendleton indicated he was

---

**4.** At the March meeting, Pendleton informed Cramer that he had two potential buyers for his station, Mr. Lapidakis and Mr. Weitzel. Pendleton asked Cramer to speak with the prospects and consider them for the station. Under the lease, Marathon has the right to choose the franchisees and refuse assignment of the lease. Mr. Cramer met with the two individuals identified by Pendleton and concluded that they would not be the best choice.

The Court heard a substantial amount of evidence regarding Cramer's review of Mr. Lapidakis and Mr. Weitzel. Pendleton claims that Cramer refused to give them adequate consideration because Cramer was determined to put dealers in the station that he preferred. That evidence is relevant to Pendleton's counterclaim of tortious interference of conduct, and not to the issue of whether less than ninety days notice was appropriate.

meeting with his lawyer on the afternoon of April 14 and would get back to Mr. Cramer that same day. He did not call Mr. Cramer, nor will he answer phone calls at the station or home. Several trips to the station by Mr. Cramer have been fruitless, as he hasn't been there. During the past couple of months, the station operation and appearance have been deteriorating. Station hours have been reduced, out of gas situations have been observed, and a lack of cleanliness [sic] has prevailed. Following a recent complaint concerning a plugged toilet in the women's restroom, we determined that the toilet has apparently been plugged for a considerable length of time.

I recommend that we proceed with cancelling the above lease immediately on the grounds of non-payment of rent, and other delinquent purchases.

Defendant's Exhibit G. Mr. Risser sent the written recommendation to Mr. Markel's office in Columbus, Ohio. Mr. Risser's office was located in Findlay, Ohio. Tr. pp. 159–60.

After Mr. Markel received Mr. Risser's recommendation, he telephoned Mr. Risser to discuss the recommendation. Mr. Markel testified that they discussed the general business relationship between Marathon and Pendleton and specifically the history of production at Pendleton's station. Tr. 159–60. Further, it was Mr. Markel's testimony that at that time he understood that Mr. Pendleton was in arrears on his note payments. Tr. 161. After his conversation with Mr. Risser, Mr. Markel directed Mr. Kevin Nowe, in-house counsel for Marathon, to draft a termination notice for Mr. Pendleton. On April 24, 1986, the notice of termination was mailed by certified mail to Mr. Pendleton.

Mr. Markel testified that there were two primary reasons for giving Mr. Pendleton ten days notice rather than ninety days notice. First, Mr. Markel, based upon his conversation with Mr. Risser, believed that Mr. Pendleton's pay habits and delinquency problems could not be resolved and that the business operation would continue to de-

cline. Tr. at 162. Second, Mr. Markel was concerned with the condition of the business operation and testified that:

I think nearly as important or perhaps more important is the effect of having a business operation that's run down misrepresents to [t]he public about being out of gas or the pump being out of order. That was probably a more important decision, the fact that the public tends to believe all Marathon stations must operate alike, and the reflection of one bad business operation will in fact impact on other Marathon business operations.

Tr. 163. Mr. Markel's decision to recommend termination effective in less than ninety days, therefore, was based upon: (1) delinquent accounts; and (2) the condition of the station. The Court now turns to an examination of whether the two asserted reasons warrant less than ninety days notice.

At the outset, the Court finds that Marathon is entitled to rely upon reasons not stated in its termination notice as justification for the less than ninety days notice. The statute requires the franchisor to give its reasons for termination in the notice. The statute does not require the franchisor to specifically identify its reasons for less than ninety days notice. The statute refers only to "circumstances." See Tr. at p. 35.

Marathon's decision to give less than ninety days notice on the basis that Pendleton was delinquent on his accounts is unreasonable because the facts establish that Mr. Pendleton was not seriously delinquent on his monthly account balance, his rent payments, and note payments. The facts further establish that those in the decision making process relied upon inaccurate information regarding Pendleton's account.

The Court finds that Marathon is estopped from relying on Pendleton's continuing monthly overdue balance as a basis for giving less than ninety day notice. Marathon asserts that notwithstanding the fact that Pendleton entered into a note in January 1985 in order to reduce his total debt, by January of 1986 Pendleton developed an overdue account balance of $3,347.93. Post Hearing Memorandum of

Plaintiff Marathon Petroleum Company, p. 11. However, the Court finds that Pendleton's January overdue account balance was not substantially higher than previous monthly balances. Although the parties have not provided the Court with each monthly statement from January 1985 through December of 1985, the Court has before it the statements of June, October, November, and December of 1985, and January, February, and March of 1986. The statements taken together establish that Marathon permitted Pendleton to carry a monthly overdue account balance of anywhere between $3,000 to $6,000.

| Statement | Balance Overdue |
| --- | --- |
| June, 1985 | $4,013.00[5] |
| October, 1985 | 4,545.63 |
| November, 1985 | 5,086.20 |
| December, 1985 | 6,513.72 |
| January, 1986 | 3,347.93 |
| February, 1986 | 5,630.39 |
| March, 1986 | 4,886.63 |

The January, February, and March, 1986, statements were the sole basis for Mr. Cramer's conclusion that Pendleton's debt was increasing. The Court finds that Marathon engaged in the practice of allowing Pendleton to carry a month to month overdue account balance of approximately $3,000 to $6,000, and to permit Marathon to assert that three particular months in a series of consistent statements is a basis for emergency action is unreasonable under the circumstances. Pendleton's account balance did not increase substantially in early 1986 as compared to late 1985. *Compare, California Petroleum Distributors*, 589 F.Supp. 282 (debt of 250,000 and demand for payment over four month period); *Loomis*, 567 F.Supp. 591 (debt of 56,-233.52 in thirty to sixty days). Furthermore, Marathon did not demand payment or demand that the balance be eliminated; rather Cramer "merely" discussed the arrearage with Pendleton during their meetings.

The Court finds that Marathon's claim that the failure of Pendleton to pay his rent timely was a consideration in the delinquency of Pendleton's accounts is unreasonable. The last statement available to Marathon before the April 18 memorandum recommending termination was the March 1986 statement. That statement, along with the preceding statements, include rent due for the month stated in the statement and the current month in which the statement is issued. In any given month, statements were issued between the fifth and eighth of the month following. Tr. 183; Tr. 31. For example, the March 1986 statement was issued between the fifth and eighth of April. The statements before the Court establish the following:

| Monthly Statement | Issued | Rent Due/Statement |
| --- | --- | --- |
| June, 1985 | July | June, July |
| October, 1985 | November | October, November |
| November, 1985 | December | November, December |
| December, 1985 | January | December, January |
| January, 1986 | February | January, February |
| February, 1986 | March | February, March |
| March, 1986 | April | March, April |

The Court finds that Marathon engaged in a practice or course of dealing with Pendleton wherein it permitted Pendleton to be at least one month in arrears on his rent payments.

The Court further finds that Mr. Pendleton, prior to April 18, 1986, was not in default on the note. The Court does not find credible the testimony of Mr. Markel that he relied on the fact that the note was in default. Mr. Risser specifically identifies "mispayments on ... outstanding note" as items of discussion between Mr. Cramer and Mr. Pendleton. Mr. Bryce R. Littleton, Jr., the person responsible for overseeing payments on the note, testified that Pendleton was not in default on the note through March of 1986. Tr. 246.

In sum, the Court finds that the asserted reason of delinquent accounts as a basis for less than ninety-days notice is unreasonable under the circumstances of this case. Marathon relies on the same legislative history cited in *Wisser*, 730 F.2d 54, for the proposition that nonpayment of obligations is a sufficient basis for less than ninety days notice. The Senate Committee

---

5. The June 1985 statement reflects an overdue account balance of $19,843.64. If one were to subtract the note balance of $15,830.72 from the June statement, the June statement would reflect an overdue account balance of approximately $4,013.72.

on Commerce comments indicate that less than ninety days notice is appropriate when the franchisee fails to pay obligations due "within a reasonable period of time." See S.Rep. No. 120, 94th Cong., 1st Sess. 8 (1975). This specific piece of legislative history is consistent with the act's requirement of reasonableness. A franchisor cannot claim that its actions are reasonable when such action is based upon inaccurate information. The franchisee is entitled to rely on competent evaluations of his account and an informed decision-making process when his accounts are considered.

The second basis for Marathon giving less than ninety days notice is Marathon's concern over the condition of the station and Pendleton's declining interest in operating the station. In this regard, the Court finds the facts establish that Mr. Pendleton's interest in the station over the months of January, February and March of 1986 declined to a point which may have adversely affected Marathon's position in the eyes of the public.

Marathon corroborated Mr. Cramer's testimony that the station was deteriorating in condition with the testimony of Mr. Gary Weiland. Mr. Weiland was the former station manager for Mr. Pendleton and worked for Mr. Pendleton for approximately three years. Tr. at p. 372. Mr. Weiland testified that during the three to four months preceding the notice of termination, the condition of the station was slowly dropping off in business and that the finances were low. Tr. pp. 373–74. Furthermore, Mr. Weiland testified that the station ran out of gas approximately once a week. *Id.* Mr. Weiland testified that when the station would run out of gas "we would first usually run out of the unleaded. I would switch the premium over to the same price as the unleaded to substitute something for the customer as long as we could then usually put an out of order, out of gas sign on the pumps and close down when we were out of gas, close down, you know, wait until, as long as we could and then leave." Tr. p. 374. Mr. Weiland also testi-

fied that Mr. Pendleton had reduced the number of hours he worked at the station from sixty to seventy five hours a week when he first began with Mr. Pendleton, to twenty to twenty five hours a week.

The Court finds that Pendleton's lack of attention to the station and his failure to maintain adequate gasoline supplies was a sufficient basis for less than ninety days notice. Mr. Pendleton offered no testimony or any other evidence to rebut Mr. Cramer's and Mr. Weiland's claim that the station was deteriorating in condition and running out of gasoline.[6] Pendleton's practice of switching the premium gasoline for non-premium and placing out of order signs on the pumps when he was out of gasoline because of his failure to purchase it amounted to misrepresentation. Marathon was not required to permit Pendleton to carry on in the same manner for another three months. Those circumstances justify less than ninety days notice.

Accordingly, the Court finds that Marathon acted reasonably under the circumstances in this case by giving less than ninety days notice. Furthermore, the Court finds that the ten day notice of termination was reasonable under the circumstances. Pendleton was on notice that Marathon was less than satisfied with his performance in the station. Through the early months of 1986 Mr. Cramer discussed Marathon's concerns with him, and Pendleton himself was considering leaving the business.

## VI. MARATHON'S CLAIM ON THE NOTE AND AMOUNTS OWING TO MARATHON.

Marathon claims that it is entitled to monies due and owing to it in the amount of $19,582.44. Pendleton offered no evidence in rebuttal to Marathon's claim of the amount owed.

The total amount includes what is due and owing on the note of $7,947.18. Pendleton makes the argument that the note has never been specifically called by Mara-

6. Mr. Pendleton did not testify and relied primarily on the cross examination of the defend-ant's witnesses to support his claim.

thon and thus he is not in default of the note. The Court finds that clearly Pendleton is in default of a note for non-payment. Accordingly, the Court finds that Marathon is entitled to the $7,947.18 attributing to the note balance.

The remaining amounts due to Marathon include 6,154.81 for gasoline purchases of April 24, 1986, and remaining arrearages of $5,480.45.

Accordingly, the Court finds that Marathon is entitled to judgment in the amount of $19,582.44.

Pendleton's and Marathon's claim for attorney fees is denied. Pendleton was unsuccessful on his counterclaim for wrongful termination under § 2802(b)(1) and is therefore not entitled to any fees under § 2805. There is no statutory basis for Marathon's claim of attorney fees.

## VII. CONCLUSION.

The Court finds that Marathon acted reasonable under the circumstances of this case in giving less than ninety days notice of termination. Further, the Court finds that the ten day notice of termination was reasonable.

Accordingly, judgment shall be entered in favor of Marathon on Pendleton's counterclaim of wrongful termination for failure to give ninety day notice. Further, the Court finds and declares that the notice of termination complied with the PMPA on Marathon's claim in Count I. Further, judgment shall be entered in favor of Marathon in the amount of $19,582.44 on Marathon's claim for monies owed in Count III. Costs are to be borne by each party.

The Court will withhold the entry of judgment consistent with this Memorandum Opinion until the Court has had an opportunity to discuss with counsel Pendleton's remaining counterclaim. The Court will conduct a status call at 8:00 a.m. on June 3, 1988 to discuss Pendleton's remaining counterclaim.

IT IS SO ORDERED.