USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 94-1616 FOUR CORNERS SERVICE STATION, INC., Plaintiff, Appellant, v. MOBIL OIL CORPORATION, Defendant, Appellee. ____________________ No. 94-1718 FOUR CORNERS SERVICE STATION, INC., Plaintiff, Appellee, v. MOBIL OIL CORPORATION, Defendant, Appellant. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Frank H. Freedman, Senior U.S. District Judge] __________________________ ____________________ Before Cyr, Circuit Judge, _____________ Bownes, Senior Circuit Judge, ____________________ and Stahl, Circuit Judge. _____________ ____________________ David R. Schaefer, with whom Brenner, Saltzman, Wallman & Goldman _________________ ____________________________________ was on brief for Four Corners Service Station, Inc. Paul D. Sanson, with whom Sheila Huddleston, Shipman & Goodwin, ______________ _________________ _________________ and Edward H. Beck, III were on brief for Mobil Oil Corporation. ___________________ ________________ March 22, 1995 ________________ CYR, Circuit Judge. Four Corners Service Station, Inc. CYR, Circuit Judge. _____________ ("Four Corners") appeals a district court judgment under the Petroleum Marketing Practices Act, 15 U.S.C. 2801-2806 (1994) ("PMPA"), disallowing its demands for compensatory damages and attorney fees against Mobil Oil Corporation ("Mobil") for unlaw- ful nonrenewal of Four Corners' franchise agreement. Mobil cross-appeals the PMPA liability judgment entered against it. We affirm the district court judgment in all respects. I I BACKGROUND BACKGROUND Four Corners is a retail gasoline distributor in Three Rivers, Massachusetts. Since 1926, Four Corners had been party to a series of renewable franchise agreements ("Agreements") with Mobil, its exclusive gasoline supplier. The Agreements obligated Four Corners to purchase a specified minimum gallonage per annum, and also set maximum gallonage limits or so-called purchase _______ "caps." These caps permitted Mobil to plan against unpredicted fluctuations in franchisee demands for gasoline. The caps increased by ten percent each year to allow for normal franchisee sales growth. In March 1987, Four Corners discovered that the soil beneath its Three Rivers service station was severely contaminat- ed with gasoline. The Massachusetts Department of Environmental Quality Engineering ("DEQE") issued a notice of responsibility, 3 citing six underground gasoline storage tanks installed by Four Corners between 1942 and 1978 as likely sources of the contamina- tion. Four Corners promptly notified Mobil that the DEQE-ordered remediation, involving the removal and replacement of the storage tanks and 250 cubic yards of contaminated soil, would require an immediate and indefinite closure of the service station, during which Four Corners would not be able to meet its minimum gal- lonage purchase obligations under the Agreements. Over the next several months, Four Corners repeatedly asked Mobil for advice and information on possible methods for implementing and funding the required remediation, but to no avail. Although it promptly completed the required tank removal, Four Corners encountered problems arranging a cost- effective method for disposing of the contaminated soil, a prerequisite to installing replacement tanks and reopening its service station. The estimated costs of transporting the contam- inated soil to an out-of-state disposal site ranged between $70,000 and $100,000, but transporters would not provide "firm" cost estimates without first reviewing DEQE site reports. DEQE in turn would not release the site reports until Four Corners signed a final contract with a transporter. Consequently, Four Corners eventually decided to "aerate," a natural remediation method which achieves decontamination on site by exposing the soil to the open air for extended periods of time. In December 1987, Mobil notified Four Corners of its decision not to renew their sixty-year-old franchise agreement, 4 effective in March 1988, due to Four Corners' breach of certain terms of their Agreements, specifically (1) its failure to meet the minimum gallonage provision; (2) its dilatory cleanup of the environmental contamination; and (3) its closure of the service station for more than seven consecutive days. In March 1989, Four Corners initiated the present action in federal district court, alleging that Mobil had wrong- fully refused to renew the franchise agreement, in violation of PMPA, 15 U.S.C. 2801-2806, for "reasons beyond [Four Corners'] control." The complaint sought reinstatement of the franchise, actual and exemplary damages, attorney fees and costs. Id.  ___ 2805. In the meantime, Four Corners had opened an expanded and modernized service station at the same site in late 1988 under new ownership and management which purchased its gaso- line supplies from British Petroleum until December 1990, and later from Exxon. In July 1991, Four Corners filed a voluntary chapter 11 petition. Following a jury-waived trial, the district court found that Mobil had violated PMPA by refusing to renew the franchise based on a breach "beyond the reasonable control of the franchis- ee." Four Corners Serv. Station, Inc. v. Mobil Oil Corp., No. _________________________________ _______________ 89-30044-FHF (D. Mass. Dec. 2, 1993) ("Four Corners I"). Mobil ______________ did not prove that Four Corners actually caused the soil contami- nation, that Four Corners had any choice but to close the station under the mandatory DEQE remediation order, nor that Four Corners 5 unreasonably failed to take the most expeditious approach for effecting soil decontamination. Id., slip op. at 14-15. The ___ PMPA violation notwithstanding, the district court declined to grant reinstatement of the franchise and addressed Four Corners' request for a remedy at law recovery of lost profits for the projected ten-year residual term of the Mobil franchise. Id. at ___ 15.1 The parties were directed to submit supplemental briefs on the right to recover lost profits. Id. at 16. ___ For the five-year period immediately preceding trial, Four Corners calculated the profits lost due to Mobil's wrongful nonrenewal at $356,099; it estimated its future lost profits for the ensuing five-year period at $171,290. These calculations were based on the contention that Mobil's greater product strength in Western Massachusetts would have enabled Four Corners to sell 30% more Mobil gasoline than it did BP gasoline between 1988 and 1990, and 20% more Mobil gasoline than it did Exxon gasoline between 1991 and 1993. The district court rejected Four Corners' "lost prof- its" calculations. It found no evidence that Mobil would have permitted Four Corners to exceed the annual purchase caps estab- lished in the Agreements. Four Corners Serv. Station, Inc. v. _________________________________ Mobil Oil Corp., No. 89-30044-FHF, slip op. at 5-8 (D. Mass. Mar. _______________ 22, 1994) ("Four Corners II"). Moreover, Four Corners actually _______________ succeeded in selling more BP and Exxon gasoline following Mobil's ____  ____________________ 1As the district court found that Mobil had not violated PMPA willfully, it denied exemplary damages as well. See infra ___ _____ note 3. 6 nonrenewal than it could have sold under the maximum Mobil gallonage limits fixed by the annual caps. Thus, the court reasoned, Four Corners experienced an increase in profits, not a reduction. Id. at 8.2 Because Four Corners proved no actual ___ damages, the court exercised its discretion, under 15 U.S.C. 2805(d)(1)(C), and denied an attorney fee award. On appeal, Four Corners challenges only the rulings denying compensatory damages and attorney fees.3 For its part, the Mobil cross-appeal chal- lenges the district court finding that Mobil violated PMPA. II II DISCUSSION DISCUSSION A. Statutory Overview A. Statutory Overview __________________  ____________________ 2The court based its findings on the following evidence: Actual Sales Potential Franchise ____________ (gallons) Mobil Sales Caps ___________ ____ 1989 1,100,892 1,431,159 824,602 1990 1,274,643 1,657,035 907,062 1991 1,083,253 1,299,904 997,767 1992 985,406 1,182,487 1,097,545 1993 (1st 185,335 222,402 301,825 quarter) 3Although the Four Corners' notice of appeal alludes to the district court rulings denying equitable relief and exemplary damages, its appellate briefs do not challenge these rulings. See ___ Licari v. Ferruzzi, 22 F.3d 344, 349 (1st Cir. 1994) (claims ______ ________ unaccompanied by adequate argumentation are deemed waived on appeal). As concerns the former issue, therefore, we must assume that Four Corners concedes that an award of lost profits for the projected ten-year residual franchise term, if proven, would have __ ______ afforded it a full and "adequate" remedy at law. Cf., e.g., ___ ____ McDonald v. Piedmont Aviation, 793 F. Supp. 75, 78 (S.D.N.Y. ________ _________________ 1992) (plaintiff waives entitlement to equitable relief by failing to appeal earlier court ruling that damages award would confer an "adequate" remedy in lieu of equitable relief). 7 Congress enacted PMPA to avert the detrimental effects on the nationwide gasoline distribution system caused by the unequal bargaining power enjoyed by large oil conglomerates over their service-station franchisees. See generally Veracka v. ___ _________ _______ Shell Oil Co., 655 F.2d 445, 448 (1st Cir. 1981); S. Rep. No. ______________ 731, 95th Cong., 2d Sess. 17-19, reprinted in 1978 U.S.C.C.A.N. _________ __ 873, 875-77. PMPA attempts to level the playing field by re- stricting the grounds upon which a franchisor can assert a unilateral termination or nonrenewal of a franchise. Grounds upon which unilateral termination by a franchisor is permitted under PMPA include (1) "[a] failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance," 15 U.S.C. 2802(b)(2)(A); (2) "[a] failure by the franchisee to exert good faith efforts to carry out the provisions of the franchise," id. ___ 2802(b)(2)(B); or (3) "[t]he occurrence of an event which is __ relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable," id. 2802(b)(2)(C). The failure of ___ a franchisee to operate the marketing premises for seven consecutive days may constitute a relevant event under PMPA 2802(b)(2)(C). Id. 2802(c)(9)(A). However, unilateral ___ termination or nonrenewal is not permitted under PMPA if the failure to comply with the terms of the franchise agreement was "beyond the reasonable control of the franchisee." Id. 2801- ___ (13). PMPA also allocates and shifts burdens of proof 8 between the parties to the franchise agreement. In a PMPA-based action for unlawful franchise termination or nonrenewal, the franchisee bears the initial burden of proving that a termination or nonrenewal occurred, at which point the burden of proof shifts to the franchisor to demonstrate that the termination or refusal to renew was based on a legitimate ground enumerated in PMPA. Id. 2805(c). ___ B. Liability: "Reasonable Control" B. Liability: "Reasonable Control" ______________________________ 1. Cause of Environmental Contamination 1. Cause of Environmental Contamination ____________________________________ The Mobil cross-appeal asserts two related challenges to the district court ruling on liability. First, it contends that there is no record support for the finding that the actual cause of the soil contamination at the Four Corners service _____ station remained "unclear." Four Corners I, slip op. at 14. _______________ Mobil notes that Four Corners was the only gas station in the vicinity of the contamination; Four Corners had sole responsibil- ____ ity for maintaining the storage tanks and was the sole target of the DEQE notice of responsibility; Four Corners concededly did not comply with environmental statutes and regulations requiring periodic testing of its storage tanks for leakage, see Mass. Gen. ___ L. Ann. ch. 148, 10 (1994); Mass. Regs. Code tit. 527, 5.05, 9.01 to 9.24 (1983); and noticeable "wet spots" were found on the outer shell of the storage tanks upon excavation. If Four Corners caused the contamination, Mobil argues, nonrenewal was not beyond Four Corners' "reasonable control." 9 We review the district court factual finding on "rea- sonable control" and its subsidiary findings on causation only for "clear error." See, e.g., Roberts v. Amoco Oil Co., 740 F.2d ___ ____ _______ _____________ 602, 608 (8th Cir. 1984) (legislative history of PMPA suggests that Congress intended to favor franchisees by treating "reason- ableness" determination as an issue of fact); Serianni v. Gulf ________ ____ Oil Corp., 662 F. Supp. 1020, 1024 (E.D. Pa. 1986); cf. Dedham _________ ___ ______ Water Co. v. Cumberland Farms Dairy, 972 F.2d 453, 457 (1st Cir. _________ ______________________ 1992) (causation in environmental context is question of fact subject to "clear error" review). Reversal is warranted only if, after considering the entire record, we are left with the "defi- nite and firm conviction that a mistake has been committed." Interstate Commerce Comm'n v. Holmes Transp., Inc., 983 F.2d ___________________________ _____________________ 1122, 1129 (1st Cir. 1993) (quoting Anderson v. City of Bessemer ________ ________________ City, 470 U.S. 564, 573 (1985)); see also Fed. R. Civ. P. 52(a). ____ ___ ____ Significantly, the burden of proof on "reasonable control" lay with Mobil, not Four Corners. See 15 U.S.C.  _____ ___ 2805(c). On appeal, Mobil must point to evidence that fairly compelled a finding that Four Corners and Four Corners alone _____ caused the contamination. See Reich v. Cambridgeport Air ___ _____ __________________ Sys., 26 F.3d 1187, 1188 (1st Cir. 1994) ("'Where there are two ____ permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.'") (citations omitted). Since it has not done so, we find no clear error. First, DEQE found no holes in the tanks. Nor did the "wet spots" constitute conclusive evidence of tank leakage, since 10 they could have been caused by contamination emanating outside the tanks. Four Corners cited a United States Environmental Protection Agency document which suggests that gasoline spills by oil transporters during gasoline delivery are among the most ___ ____________ common causes of soil contamination at service stations. See 53 ___ Fed. Reg. 37087, 37090, 37133 (1988). Finally, the notice of responsibility issued by DEQE rested on Four Corners' legal status as the current owner/operator of the service station facility for strict liability purposes only. It did not purport ______ _________ to represent a determination that Four Corners caused the con- tamination. Likewise, the record evidence does not compel a finding that Four Corners might have averted the bulk of the soil con- tamination by more diligent testing of its tanks. Mobil neither produced evidence as to when the contamination occurred, nor ________ ____ asserted that the environmental "detection" statutes and regula- tions of the 1980s were retroactive. Further, there was no evidence which would exclude leakage from other pumping system components (pumps, hoses, pipes); that is, leakage which could not have been detected by testing the tanks. Finally, since there was no evidence that Mobil investigated any of these matters before it decided not to renew the Four Corners fran- ______ chise, the district court might well have treated this contention as a post hoc rationalization. See Desfosses v. Wallace Energy, ____ ___ ___ _________ _______________ Inc., 836 F.2d 22, 29 (1st Cir. 1987) (noting that PMPA notifica- ____ tion requirements ensure that franchisor cannot invent after-the- 11 fact justifications for termination or nonrenewal). As Mobil failed to meet its burden of proof on the factual issues underly- ing the district court ruling on "reasonable control," the finding stands. 12 2. "Financial Inability" to Remediate 2. "Financial Inability" to Remediate _________________________________ Mobil likewise challenges the district court ruling that Four Corners lacked the financial ability to remediate the soil contamination. It contends that the ruling was infected by legal error, in that the court wrongly regarded Four Corners' financial inability to pay for out-of-state disposal, the costli- er but more expeditious method of remediation, as a circumstance beyond the franchisee's reasonable control. If this were true, Mobil argues, any franchisee who came upon hard times and could not afford to pay Mobil for its oil purchases would be exempt from unilateral termination. See, e.g., California Petroleum ___ ____ _____________________ Distribs. v. Chevron U.S.A., 589 F. Supp. 282, 288 (E.D.N.Y. _________ _______________ 1984); Cantrell v. Exxon Co., U.S.A., 574 F. Supp. 313, 317 (M.D. ________ _________________ Tenn. 1983). Even if we were to agree with the reasoning of the two decisions cited by Mobil, however, the district court simply did not find that Four Corners' choice of a less expeditious remediation program was beyond its reasonable control because _______ Four Corners could not afford more expeditious measures. Indeed, Four Corners itself adduced evidence that its then owner, Richard Tenczar, could have obtained financing for out-of-state disposal if necessary. Mobil's contention is a thinly veiled attempt to frame the present "clear error" challenge, see Roberts, 740 F.2d at ___ _______ 608, as an issue of law subject to de novo review. See Cumpiano __ ____ ___ ________ v. Banco Santander Puerto Rico, 902 F.2d 148, 154 (1st Cir. 1990) ___________________________ ("The 'clearly erroneous' rule cannot be evaded by the simple 13 expedient of [the] creative relabelling . . . by dressing factual disputes in 'legal' costumery."). The central inquiry that of "reasonableness" must be undertaken in light of all the cir- ___ cumstances. In that vein, we cannot ignore the subsidiary finding by the district court that Mobil repeatedly ignored Four Corners' pleas for guidance and assistance on how best to reme- diate service-station soil contamination. See Four Corners I, ___ _______________ slip op. at 14 ("Mobil offered no assistance that was refused by Four Corners which would evidence a lack of desire on the part of Four Corners to remedy the problem as expeditiously as possi- ble."); cf., e.g., Malone v. Crown Cent. Petroleum Corp., 474 F. __ ____ ______ ___________________________ Supp. 306, 311 (D. Md. 1979) (upholding franchise termination where franchisee deliberately failed to heed franchisor's warn- ings or accept its "good faith" advice about more profitable marketing strategies). Four Corners was left entirely to its own devices, in the awkward position of having to determine the most cost-effective remediation method, which involved balancing projected future service-station revenue losses occasioned by a more prolonged closure, against the unconfirmable but unquestionably higher immediate costs of a more expeditious remediation. In these circumstances, the district court reason- ably could find that Four Corners acted in good faith, and that Mobil's reticence to assist was prompted by its desire to rid itself of the franchisee requesting its assistance. As there was no clear error, the liability judgment against Mobil must stand. 14 15 C. Damages C. Damages _______ 1. The Maximum Gallonage Provision 1. The Maximum Gallonage Provision _______________________________ Four Corners impugns the district court's reliance on the annual gallonage caps as the basis for finding that Four ____ Corners lost no profits as a result of the nonrenewal. It argues that the district court was required to predict whether Mobil would have waived the caps in each successive year had the franchise not been wrongfully terminated in 1988. It points out that a Mobil manager testified that Mobil had an "internal mechanism" for authorizing such waivers where franchisees have renovated or expanded service stations in order to increase their gasoline sales by more than ten percent over the previous year. Consequently, Four Corners contends, were Mobil to have refused a waiver in these circumstances its action would have been arbi- trary and discriminatory, in violation of PMPA. Normally, the plaintiff must bear the burden of proving actual damages. See, e.g., Wells Real Estate, Inc. v. Greater ___ ____ ________________________ _______ Lowell Bd. of Realtors, 850 F.2d 803, 816 (1st Cir.) (citing ________________________ cases), cert. denied, 488 U.S. 955 (1988). Four Corners has not _____ ______ suggested that a different burden allocation obtains under PMPA. Therefore, we assume that the burden of proof rested with Four Corners. A challenge to the district court's findings on the actual amount of damages sustained by a claimant presents a question of fact, which we review only for "clear error." See, ___ e.g., American Title Ins. Co. v. East West Fin. Corp., 16 F.3d ____ ________________________ _____________________ 449, 461 (1st Cir. 1994). 16 The record evidence did not compel a finding that Mobil would have waived the 1988-91 caps on Four Corners' gasoline purchases. Judy Schultz, district sales manager for Mobil, testified that Mobil imposed these contractual caps to protect itself from the considerable expense which would attend unpre- dictable or unanticipated increases in franchisee demand for on- hand gasoline supplies. She further noted that the gallonage caps automatically increased by ten percent per year. A franchi- see which wanted a waiver of the cap would need to obtain prior approval from the general manager for the Mobil region, the wholesale manager, and the district sales manager. When pressed by Four Corners, however, Schultz testified that she did not know of any Mobil franchisee which had actually obtained a waiver. Even assuming, arguendo, that Four Corners' burden of ________ proof could have been sustained by showing that Mobil had an established "internal mechanism" for affording relief from the gallonage caps beyond the automatic ten-percent annual increase, and that Four Corners itself met the criteria for such a waiver in the years 1988-91, the Schultz testimony fell well short of such a showing. It identified no criteria, nor did it indicate that any such waiver procedure had ever been invoked, either by ____ Mobil or a franchisee. Moreover, Four Corners proffered no __ independent evidence that any Mobil franchisee, let alone a ___ franchisee in a position comparable to Four Corners', had ever requested or been granted any such extraordinary waiver. Cf., ___ e.g., Ewing v. Amoco Oil Co., 823 F.2d 1432, 1438 (10th Cir. ____ _____ ______________ 17 1987) (noting existence of factual dispute whether franchisor offered plaintiff less favorable terms than its other franchisees); Valentine v. Mobil Oil Corp., 614 F. Supp. 33, 39 _________ ________________ (D. Ariz. 1984) (finding no evidence that franchisor treated plaintiff differently than franchisor's other franchisees), aff'd, 789 F.2d 1388 (9th Cir. 1986). Thus, there is no record _____ evidence even suggesting that the district court finding that Four Corners would not have been granted a gallonage cap waiver constituted clear error. See Four Corners II, slip op. at 8. ___ _______________ 2. Lost Profits for 1992 and 1993 2. Lost Profits for 1992 and 1993 ______________________________ Next, Four Corners contends that it lost profits in 1992, and during the first quarter of 1993, when the gallonage caps under its wrongfully terminated Mobil franchise first began to exceed its actual Exxon gasoline sales or its potential Mobil ______ gasoline sales. See supra note 2. For example, in 1992, Four ___ _____ Corners could have sold 112,139 more gallons (viz., the differ- ___ ence between its 1,097,545 gallon Mobil cap and its actual Exxon sales of 985,406 gallons) even assuming that Mobil refused to ____ ________ waive its cap. Thus, Four Corners claims, it was entitled to recover these discrete losses, which were proximately caused by Mobil's wrongful nonrenewal under PMPA. This claim can succeed only if the measure of compen- _______ satory damages under PMPA may exceed the level required to make ______ ______ the plaintiff-franchisee whole for whatever injury or loss flowed _____ from the franchisor's wrongful conduct. But cf., e.g., Linn v. ___ ___ ____ ____ Andover Newton Theological Sch., 874 F.2d 1, 8 (1st Cir. 1989) ________________________________ 18 (noting that plaintiff failed to suggest that either the ADEA or contract law entitled him to be made "more than whole"). Four Corners points to no authority for this counterintuitive assump- tion, nor is there anything in PMPA's language or legislative history to suggest that Congress intended to deviate from the normal presumption, uniformly applied to numerous other causes of action arising under federal remedial statutes, that compensatory ____________ damages may not exceed the amount necessary to make the injured party whole. See, e.g., Midwest Petroleum Co. v. American _____ ___ ____ ______________________ ________ Petrofina Mktg., Inc., 644 F. Supp. 1067, 1071 (E.D. Mo. 1986) ______________________ (noting PMPA franchisee is not entitled to "double recovery" where it has otherwise mitigated harmful effects of defendant's violation); see also Russo v. Texaco Inc., 630 F. Supp. 682, 687 ___ ____ _____ ___________ (E.D.N.Y.) (PMPA is a diminution of franchisors' common-law contract rights, and its remedial provisions should not be unduly extended beyond statute's express language and purpose), aff'd, _____ 808 F.2d 221 (2d Cir. 1986). Since Four Corners requested the district court to presume that its sixty-year-old Mobil franchise would have remained in force another ten years but for Mobil's wrongful nonrenewal, the court was required to determine the aggregate net _________ ___ profits Four Corners would lose during the entire ten-year ______ period. The record evidence reveals that Four Corners actually realized an overall increase approximating $215,000, in total net ________ profits and interest, as a consequence of having been freed from the Mobil gallonage caps during the five years immediately 19 preceding trial.4 Thus, the profits allegedly lost in 1992-93 clearly were not recoverable as discrete losses over and above the incidental profits gained during the entire five-year period. 3. Future Profits 3. Future Profits ______________ Four Corners insists that the district court simply ignored its claim to $171,290 in future lost profits. See ______ ___ Thompson v. Kerr-McGee Ref. Corp., 660 F.2d 1380, 1388 (10th Cir. ________ _____________________ 1981) (future lost profits recoverable under PMPA), cert. denied, _____ ______ 455 U.S. 1019 (1982); cf. Wallace Motor Sales, Inc. v. American ___ _________________________ ________ Motor Sales Corp., 780 F.2d 1049, 1062 (1st Cir. 1985) (automo- _________________ bile dealership entitled to claim damages for lost profits over projected life span of franchise). Although Four Corners would incur these damages in each future year because the gallonage caps would continue to outstrip Four Corners' actual sales of Exxon gasoline, or its projected sales of Mobil gasoline, until 1998, this claim too is flawed.  ____________________ 4Assuming constant retail prices and operating costs, the following would approximate Four Corners' profits (losses) during each of the five years immediately preceding trial: Change in Estima- Interest Total Net Profits ted Int- on Gain or as Mobil Sta- erest Profit Loss tion with Rate Caps in Force ___________________________________________________________ 1988: ($ 1,004) 52% ($ 528) ($ 1,532) 1989: $ 69,571 45% $ 31,306 $100,877 1990: $100,426 34% $ 34,144 $134,570 1991: $ 21,655 22% $ 4,764 $ 26,419 1992: ($ 19,568) 10% ($ 1,956) ($ 21,524) 1993: ($ 22,872) 3% ($ 686) ($ 23,558) ____________________________________________________________ Total $148,208 $ 67,044 $215,252 20 In truth, the district court was fully cognizant of Four Corners' claim for future profits, as it explicitly acknowl- edged in its opinion. See Four Corners II, slip op. at 3. ___ ________________ Moreover, the record evidence discloses that there was little likelihood that Four Corners could have remained in business until 1998. Furthermore, there were serious deficiencies in its forecasts of future lost profits. See Levy v. FDIC, 7 F.3d 1054, ___ ____ ____ 1056 (1st Cir. 1993) (appellate court is free to affirm on any ground supported by record). Four Corners extrapolated its estimates of future lost ____ profits based on its performance during the two years immediately preceding trial; that is, it assumed that Mobil's refusal to renew its franchise was alone responsible for the dismal profit picture during the time Four Corners was in serious financial straits and selling Exxon gasoline.5 During the first quarter of 1993 alone, Four Corners lost $47,754, compared with a $107- ,154 net profit in 1990, this notwithstanding the infusion of _______________ approximately $215,000 in profits and interest income which could not have been realized but for Mobil's termination of the fran- chise in 1988. See supra note 4. Thus, Four Corners projected ___ _____ continued future business operations despite such severe losses  ____________________ 5The chapter 11 filing constituted an event of default under the Agreements, see Agreement 24(B)(4), and may have afforded ___ Mobil an independent basis for termination or nonrenewal in 1991. Although it is questionable whether a franchisor could rely on such an event to cut off PMPA damages if it appeared that the __ franchisor wrongfully refused to renew prior to the chapter 11 petition, thereby causing the franchisee's financial problems, _______ Four Corners' greater profits in the years 1988-91 tend to _______ _______ undercut such a causal connection. 21 as would make its prospects for continued operation until 1998 _____ ____ highly speculative. See Midwest Petroleum Co., 644 F. Supp. at ___ _____________________ 1070 ("To warrant a recovery of lost profits, the [franchisee] must present proof sufficient to bring the issue outside the realm of conjecture, speculation or opinion unfounded on definite facts."). Finally, even if Four Corners had been able to continue in business until 1998, its claim to $171,000 in future lost profits would be groundless given the record evidence that it had already realized an aggregate net increase in profits and inter- ________ est approximating $215,000 during the five-year period immediate- ly prior to trial. See supra note 4. Accordingly, even if the ___ _____ district court had allowed all speculative lost future profits claimed, Four Corners still would have realized approximately $44,000 in aggregate net profits ($215,000 net increased profits, less $177,000 future profits) during the projected ten-year life span of the franchise following Mobil's wrongful refusal to renew. D. Attorney Fees Under PMPA D. Attorney Fees Under PMPA ________________________ Lastly, Four Corners challenges the denial of its request for an attorney fee award against Mobil based on the PMPA violation. First, it claims that the district court's factual findings were inadequate under Fed. R. Civ. P. 52. Second, it says that the district court was somehow constrained to allow a fee award because Congress meant to encourage prevailing franchi- sees to vindicate their rights under PMPA. 22 A denial of an attorney fee award is reviewed only for abuse of discretion. See Catullo v. Metzner, 834 F.2d 1075, 1085 ___ _______ _______ (1st Cir. 1987). Under PMPA, see 15 U.S.C. 2805(d)(1)(C), an ___ attorney fee award is discretionary where the plaintiff recovers neither actual nor exemplary damages. Not only did Four Corners sustain no provable damages, but the record evidence indicates that it generated approximately $44,000 more in aggregate net profits during the projected remaining life span of the Mobil franchise as a consequence of having been freed from the Mobil franchise gallonage caps since 1988. Four Corners likewise failed to win equitable reinstatement of its Mobil franchise. Cf. Chestnut Hill Gulf, Inc. v. Cumberland Farms, Inc., 749 F. __ ________________________ _______________________ Supp. 331, 333 (D. Mass. 1990) (plaintiff which obtains equitable relief under PMPA is entitled to attorney fee award even absent recovery of actual or exemplary damages). Without in any sense diminishing Mobil's clear viola- tion of PMPA, we cannot say that the district court abused its discretion in denying an attorney fee award on the present record. Nor do we think that Congress intended to compel attor- ______ ney fee awards under PMPA as an inducement to franchisees to pursue vindication in these circumstances. The district court judgment is affirmed. Costs are The district court judgment is affirmed. Costs are __________________________________________ _________ awarded to cross-appellee in appeal No. 94-1718. awarded to cross-appellee in appeal No. 94-1718. _______________________________________________ 23